Opinion
ELIA, J.
Mario M. (father) and Christina C. (mother) appeal a judgment terminating their parental rights to their twin daughters, Beatrice and Lupe M. They argue on appeal that their case came within the exception in Welfare and Institutions Code[1] section 366.26, subdivision (c)(1)(A) and that the juvenile court improperly interpreted this statute; that the court incorrectly concluded that mother did not have a parental relationship with her daughters; that guardianship, and not adoption, should have been the permanent plan for their children; and that the juvenile court improperly designated the social worker an expert in assessment and selection of permanency plans for dependent minors. We find no error, and will affirm the judgment terminating parental rights.

*1414
Factual and Procedural Background

Beatrice and Lupe were born on May 17, 1990, suffering from prenatal exposure to heroin and cocaine. They were placed on the following day with their maternal aunt Natalie A., and have lived with her since. A public health nurse has followed the girls’ progress since that time.
Petitions under section 300, subdivision (b) were filed on June 21, 1990. They alleged that the girls were born with positive toxicology screens, that both parents had a history of drug abuse, that mother admitted using drugs during her pregnancy and was requesting assistance with treatment, and that father’s whereabouts were unknown. After mother admitted the truth of the allegations, the petitions were sustained and the girls were adjudicated dependents at a combined jurisdictional and dispositional hearing on July 20. A reunification plan for mother, including participation in a drug rehabilitation program, was instituted.
The six-month review hearing was held on December 14, 1990. Mother was in drug rehabilitation, and regularly visiting the girls. Father had made telephone contact with the social worker and signed a service plan. While still showing the effects of prenatal drug exposure, the girls were doing well in their aunt’s care. The social worker recommended a continuation of reunification.
The 12-month review hearing under section 366.21, subdivision (e) took place on June 10,1992. The girls were reported “healthy and secure” in their aunt’s care. Both parents were present, and the court made a paternity finding as to father. Although father was in drug rehabilitation, he was also incarcerated. Mother had made limited progress towards reunification. Nonetheless, the social worker opined there was a substantial possibility the girls could be returned home within six months, and further reunification services were recommended and ordered.
The 18-month, section 366.22 hearing was held on December 4,1991. The social worker reported the girls healthy, and meeting developmental milestones. Their aunt had committed herself to caring for them permanently. The aunt had reported to the social worker that starting in June, mother had started either missing or appearing under the influence during visits. Visits had taken place informally approximately three times a week at the maternal grandmother’s house, when the aunt brought the girls to visit. Although mother had completed drug rehabilitation, she had not enrolled in after care, and had some positive drug tests during the summer. Although she had reported being employed, she had failed to verify this. In addition, the aunt *1415 had expressed concern about mother’s lack of care for her six- and fifteen-year-old children during this period.
Starting in July, mother did not show up for chemical testing, and also failed to attend Narcotics Anonymous/Alcoholics Anonymous meetings, as required by the service plan. Father was incarcerated and was believed to be unavailable for at least two years. Due to the parents’ continuing problems with substance abuse, and mother’s failure to complete the goals of her service plan, the social worker recommended termination of reunification services. The juvenile court made orders effectuating these recommendations, and scheduling a section 366.26 hearing.
This hearing was conducted on April 13, 1992. The social worker recommended long-term relative care with the maternal aunt. Mother was then incarcerated for a probation violation, and father was also in state prison. The aunt had applied to adopt the minors, but the adoptive home study had not yet been completed, and due to an inadequate number of bedrooms, she could not be licensed as a foster home in the interim. A permanent plan of adoption would replace the current permanent plan in the near future. Guardianship was not recommended because it would result in a reduction of the aunt’s already marginal income which could result in detriment to the children. A permanent plan of long-term foster care was adopted.
A contested section 366.3 hearing next took place on December 3, 1992, and January 4, 1993. Since the adoptive home study on the aunt was almost completed and approval was anticipated, respondent department of family and children’s services (Department) requested a hearing in 120 days to change the permanent plan from long-term care to adoption. Mother had been sober for nearly a year, was visiting the girls, and requested six additional months of reunification services. The court noted that mother’s sobriety had only been at times when she was incarcerated or in drug treatment, that the children were thriving in their aunt’s care, and that it was not in their best interests to return to reunification. It ordered long-term care to continue, and set another section 366.26 hearing for April 26, 1993.
Mother appealed from these orders, and her appointed counsel filed a Wende brief (People v. Wende (1979) 25 Cal.3d 436 [158 Cal.Rptr. 839, 600 P.2d 1071]). We reviewed the entire record, concluded there were no arguable issues on appeal, and affirmed the juvenile court’s orders. (In re Beatrice M. (Oct. 5, 1993) H010694 [nonpub. opn.].)
Mother filed a section 388 petition on August 17, 1993. The petition alleged that she had been sober for 18 months; that she had moved the *1416 previous month into the apartment below the girls and spent many hours daily with them; that she had a job with a good income and insurance; that her other two children were living with her, doing well, and bonding with their siblings; that the twins were affectionate to her and called her “mommy” or “mommy Christy”; and that she wished the children returned to her custody with the aunt being able to visit. The motion was summarily denied on October 25, 1993, on the grounds the petition did not present a prima facie case the children would benefit from the proposed orders. On October 29, mother sought rehearing under section 252, a request the presiding judge denied on November 4. Mother then filed a petition for an extraordinary writ in this court (HOI 1904), which we summarily denied on November 22,1993. (Christina C. v. Superior Court (Nov. 22, 1993) H011904 [nonpub. opn.].)
The second section 366.26 hearing was held on January 12, 1994. At the conclusion of this hearing, the juvenile court found, by clear and convincing evidence, that it was likely the girls would be adopted, that terminating parental rights would not be detrimental to them, and that such a course would be in their best interests. It then took the matter under submission, indicating its intention to keep the girls with their aunt, and to free them for adoption. On February 9, 1994, the court ordered parental rights terminated, and appointed the aunt temporary guardian until the adoption was finalized.
Mother and father both appeal these orders.

Discussion

A. Section 366.26, Subdivision (c)(1)(A)

At the selection and implementation hearing held pursuant to section 366.26, a juvenile court must make one of four possible alternative permanent plans for a minor child (subd. (b)(1)-(4)). The permanent plan preferred by the Legislature is adoption. (In re Brian R. (1991) 2 Cal.App.4th 904, 923-924 [3 Cal.Rptr.2d 768].) If a court finds a child adoptable, it must terminate parental rights absent four specified circumstances in which it would be detrimental (§ 366.26, subd. (c)(1)(A)-(D)). The first of these, and the one appellants argue the juvenile court misinterpreted, states “The parents or guardians have maintained regular visitation and contact with the minor and the minor would benefit from continuing the relationship.”
The social worker testified at the section 366.26 hearing that mother had visited frequently with the girls since the previous January, and since she had moved into the apartment below Natalie A. in July 1993, had visited *1417 daily with them and had taken care of them on occasion. Father had moved into the complex in December 1993, after his release from prison, and also had daily contact with the children. The families often eat together at one apartment or the other. Beatrice often asks to go downstairs; Lupe asks less frequently and doesn’t stay as long. Beatrice asks to stay the night at her parents’ apartment. This was “a big family that gets together and spends time together.”
The social worker also testified that during the previous year, mother’s visits had been regular, and that her visits were beneficial to the girls; “[c]hildren benefit from having a lot of family who love them. It has to be beneficial. . . . H] The more family they have, the better it is for them.” She also opined, however, that if the mother were no longer able to visit the girls, “It would be sad but it wouldn’t be detrimental.”
Mother testified that she saw both herself and Natalie as mothers to the girls, but since they had been with their Aunt Natalie since birth, she considered her their “primary mother.”
At the end of the hearing, the juvenile court stated: “[I]t is my understanding that the Legislature intended in the 366.26(c)(1) to refer to circumstances where children would benefit from a continuing parent/child relationship with the parent, and that in those circumstances it would be inappropriate to terminate parental rights. And, in fact, the Code section says termination would be detrimental to the child because the parents have maintained regular visits, and the child would benefit from a continuing parent/child relationship. I don’t believe the evidence shows that in this case. Q] The evidence does indicate that the children do benefit from the relationship and the contacts that they have with their parents, and I don’t think there’s any question about that. But the evidence does not place these children within that exception, [f] I think [the social worker] is right, to the extent that she indicates [aunt] Natalie has done beautifully. Despite all the things that have happened, despite the father was in prison or jail for a long period of time in these children’s lives, when he comes out, she immediately allows him to begin a relationship with these children, and she has allowed this mother to have an ongoing relationship with these two girls. . . . Natalie has been able to ... do what she feels is appropriate for the best interests of the children, and she apparently feels that having contact and a relationship with the parents, with the biological parents benefits these children. ...[][] Termination of parental rights would not be detrimental to these children, as defined by Section 366.26(c)(1) of the Welfare and Institutions Code.”
Appellants argue that since there was evidence the parents regularly visited the girls and that the girls would benefit from continuing the relationship, the juvenile court erred in concluding appellants did not come *1418 within the exception in section 366.26, subdivision (c)(1)(A) to terminating their parental rights. We disagree.
Although the kind of parent/child relationship which must exist in order to trigger the application of section 366.26, subdivision (c)(1)(A) is not defined in the statute, it must be sufficiently strong that the child would suffer detriment from its termination. In In re Autumn H. (1994) 27 Cal.App.4th 567, 576 [32 Cal.Rptr.2d 535] the Fourth Appellate District defined the “benefit” from continuing such a relationship as follows: “In the context of the dependency scheme prescribed by the Legislature, we interpret the ‘benefit from continuing the [parent/child] relationship’ exception to mean the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent’s rights are not terminated.” (In re Autumn H., supra, 27 Cal.App.4th 567, 575.)
We agree with this analysis. The purpose of section 366.26 is to select a permanent plan for a child who cannot return home because reunification efforts have failed. This was the case here; father had been incarcerated for most of the girls’ lives; and mother’s life had only become drug-free during the previous year. Since appellants had failed to correct the problems underlying the girls’ dependency in the 18 months allowed them for reunification, reunification services had been terminated in December 1991, when the girls were almost 19 months old.
At this point the focus of the dependency proceedings shifted, properly, to planning an alternative to the girls’ return to mother and father. The social worker had reported from the time of the six-month review that the girls were thriving in the care of their Aunt Natalie, who had expressed a desire to care for them permanently. Since the juvenile court found the girls adoptable, a finding appellants do not contest, the juvenile court was required to choose adoption as the permanent plan, absent detriment to the girls from terminating parental rights. (Jones T. v. Superior Court (1989) 215 Cal.App.3d 240, 250 [264 Cal.Rptr. 4].)
We do not agree that frequent and loving contact with the girls is sufficient to establish the “benefit from a continuing relationship” contemplated by the statute. No matter how loving and frequent their contact with *1419 the girls, appellants had not occupied a parental role in relation to them at any time during their lives. “Interaction between [a] natural parent and child will always confer some incidental benefit to the child .... The exception applies only where the court finds regular visits and contact have continued or developed a significant, positive, emotional attachment from child to parent.” (In re Autumn H., supra, 27 Cal.App.4th at p. 575.)
The social worker testified at the section 366.26 hearing that both girls looked to their aunt as their mother figure. This is only to be expected: The girls had lived with their Aunt Natalie—literally—from day one. From their infancy, when they had special needs as a result of mother’s substance abuse during pregnancy, to the day of the section 366.26 hearing, she had been the one comforting and nurturing them by providing their day-to-day care.
The girls’ aunt had also determined that having contact with mother and father, once they were free from substance abuse and prison, would be beneficial to the girls. This is a credit to her judgment and generosity. It does not follow that since the girls have a loving and happy relationship with mother and father, however, that the juvenile court should have determined the statutory exception to termination of parental rights applied.
Appellants do not wish the girls returned to their custody, but argue that guardianship by Natalie would give them a better chance of ensuring their continuing relationship with their daughters. The Legislature has decreed, however, that guardianship is not in the best interests of children who cannot be returned to their parents. These children can be afforded the best possible opportunity to get on with the task of growing up by placing them in the most permanent and secure alternative that can be afforded them. In decreeing adoption to be the preferred permanent plan, the Legislature recognized that, “Although guardianship may be a more stable solution than foster care, it is not irrevocable and thus falls short of the secure and permanent placement intended by the Legislature.” (Jones T. v. Superior Court, supra, 215 Cal.App.3d at p. 251.)
The social worker testified that it would not be detrimental to Beatrice to terminate her parental relationships with mother and father, because “The relationship that she has with her mother is a close relationship, as she has with the extended, with other members of the extended family. She sees her more in the role of an aunt. The relationship she has with her father is a developing relationship. She has only known him for the past few weeks.” As to Lupe, the social worker testified, similarly, that terminating parental rights would not be detrimental because “the relationship that she has with her mother is more like the relationship she has—that one would have with *1420 an aunt, a close aunt. She sees a lot of her and she loves her, but she does not have a mother/child relationship with her.”
Since the Legislature has mandated that dependent children who cannot be reunified with their parents be provided the most stable possible homes, we conclude the juvenile court correctly interpreted section 366.26, subdivision (c)(1)(A) to apply to situations where a dependent child benefits from a continuing parental relationship; not one, like that here, when a parent has frequent contact with but does not stand in a parental role to the child.
B. Guardianship
The previous discussion also controls our resolution of the next issue raised by appellants; that guardianship, and not adoption, was in the best interests of the girls. They argue that guardianship would have ensured the continuation of their relationship with the girls, but that terminating their parental rights gave neither parents nor children any such guarantees.
They are correct that a permanent plan of adoption does not guarantee their continuing relationship with their daughters. But parental rights must be terminated to free children to be adopted into a new, permanent family. And guardianship is only the best possible permanent plan for children in circumstances where the exceptions to terminating parental rights in section 366.26, subdivision (c)(1) apply. Since we have already determined that appellants’ relationship with the girls did not place them within these exceptions, it necessarily follows that the juvenile court correctly determined that adoption was the appropriate permanent plan for them.
C. Parental Relationship
There is little more to add to dispose of appellants’ third issue, that the juvenile court incorrectly concluded that mother did not have a parental relationship with the girls. As we have already discussed, the social worker testified that both girls view Aunt Natalie as their mother, and that while their relationship with mother was loving and affectionate, they viewed her more as an aunt than a mother. It is evident from this record that Natalie occupied the primary parental role for the girls, and that their relationship with their mother was akin to that of an extended family member. The juvenile court thus correctly concluded that mother’s relationship with the girls was not a parental one.
D. Expert Witness
Respondent Department offered the social worker as an expert “in the assessment and selection of permanency planning for a dependent minor.” All other counsel had an opportunity to question her on voir dire. The *1421 motion was then submitted and the juvenile court granted it. Appellants argue that this ruling was error. We disagree.
The social worker testified she was not familiar with the legal process by which a guardianship is terminated. Father’s counsel then asked her if, in light of this, she could really assess the permanency of a guardianship. She responded that one of the reasons she considered adoption more permanent than guardianship is that guardianship could be terminated. Counsel next suggested that “you don’t know what the reasons for that termination would be, in terms of protecting the interests of the children.” The social worker replied that she did not know the “legal issues.” On this basis, counsel asked the juvenile court to strike the social worker’s expert testimony in preferring adoption over guardianship, a request the court denied.
Evidence Code section 720 states “(a) A person is qualified to testify as an expert if he [or she] has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his [or her] testimony relates. Against the objection of a party, such special knowledge, skill, experience, training, or education must be shown before the witness may testify as an expert.” A trial court has discretion to determine whether a proposed witness is qualified to testify as an expert under this statute, and this determination will not be disturbed absent an abuse of discretion. (People v. Doss (1992) 4 Cal.App.4th 1585, 1595 [6 Cal.Rptr.2d 590].) We find no abuse of discretion here.
Appellants point only to the social worker’s lack of knowledge of the legal procedures for terminating guardianship as a reason she should have been denied expert witness status. Her lack of knowledge of these procedures is unrelated to her expertise, however. She testified as to the girls’ adoptability; the suitability of adoption, rather than guardianship, as the appropriate permanent plan for them; and whether terminating mother and father’s parental rights would be detrimental to them. Appellants have pointed to nothing which leads us to question the trial court’s decision to allow her, on the basis of her education, training and experience, to testify as an expert on these matters. We therefore conclude the trial court properly exercised its discretion in qualifying the social worker as an expert witness.

Disposition

The judgment terminating parental rights is affirmed.
Premo, Acting P. J., and Bamattre-Manoukian, J., concurred.
Appellants’ petition for review by the Supreme Court was denied January 19, 1995.

All further unspecified section references are to the Welfare and Institutions Code unless otherwise noted.