Filed 9/17/14  In re K.G. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re K.G. et al., Persons Coming Under the Juvenile Court Law. | |
| | D066010 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. SJ012119A-B) |
| v. | |
| ASHLEY H., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of San Diego County, Kimberlee A. Lagotta, Judge.  Affirmed.

Lelah S. Fisher, under appointment by the Court of Appeal, for Defendant and Appellant Ashley H.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Patrice Plattner-Grainger, Deputy County Counsel, for Plaintiff and Respondent.

Ashley H. appeals from orders terminating parental rights to her children, K.G. (born 2008) and K.J.G. (born 2009, together the children). She argues the juvenile court erred in not applying the beneficial relationship exception to termination of parental rights. (Welf. & Inst. Code, § 366.26, subd. (c)(1)(B)(i); undesignated statutory references are to this code.) We find no error and affirm the orders.

FACTUAL AND PROCEDURAL BACKGROUND

A. First Dependency Proceeding (January 2009 to August 2010)

Ashley has a long history of substance abuse, beginning at the age of 12 when she started smoking marijuana. At age 16, she began using methamphetamine with the children's father, Bruce G. At age 18, she gave birth to K.G. When K.G. was six months old, the San Diego County Health and Human Services Agency (the Agency) filed a petition on her behalf alleging the parents were unable to provide regular care due to excessive use of methamphetamine and marijuana. The juvenile court detained K.G. in the licensed foster home of Maricela and Rueben C. (the Cs).

In late 2009, Ashley gave birth to K.J.G. The Agency opened a voluntary services case for K.J.G. so she could remain with Ashley while Ashley completed reunification services. In August 2010, K.G.'s first dependency case was closed with sole physical custody granted to Ashley. By that time, Ashley had achieved at least a year of sobriety and completed therapy, parenting and anger management classes.

B. The Second Dependency Proceeding (June 2012 to Present)

By August 2011, the parents were no longer drug free. In June 2012, the Agency filed petitions on behalf of the children alleging the parents were unable to provide

2

regular care due to substance abuse, Ashley's whereabouts were unknown and she had been leaving the children at various homes, including with the Cs. The children were detained together with the Cs.

In July 2012, the juvenile court sustained the petitions, declared the children dependents and ordered the parents to comply with the requirements of the case plan. At the six-month review hearing in February 2013, the court terminated court-mandated reunification services for Bruce, but continued services for Ashley. At an uncontested 12-month review hearing in July 2013, the juvenile court followed the social worker's recommendations and continued Ashley's services to the 18-month review date. At the 18-month review hearing in January 2014, the juvenile court terminated court-mandated reunification services for Ashley, continued the children in foster care, and set a hearing under section 366.26.

At the contested section 366.26 hearing in May 2014, the court heard testimony from Ashley, Bruce, a maternal aunt, the foster mother, two social workers and a therapist that worked with the children and Ashley. The court also received stipulated testimony from the children. The court found the children adoptable, determined none of the exceptions to adoption contained in section 366.26, subdivision (c)(1) existed, terminated parental rights and declared the children freed for adoption. It also granted the Cs' request for prospective adoptive parent status. Ashley timely appealed.

DISCUSSION

Parental rights may be terminated if there is clear and convincing evidence of adoptability (§ 366.26, subd. (c)(1)); however, an exception exists where a parent has "maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) A beneficial relationship is one that promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with adoptive parents. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) The parent must show that the parent-child relationship is such that the child will be greatly harmed by the termination of parental rights, so that the presumption in favor of adoption is overcome. (*In re Brittany C.* (1999) 76 Cal.App.4th 847, 853-854.)

Implicit in this standard is that "a parental relationship is necessary for the exception to apply, not merely a friendly or familiar one." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350.) The existence of this relationship is determined by taking into consideration "[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs. . . ." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.) There is a split of authority regarding whether an appellate court reviews a challenge involving the beneficial relationship exception for substantial evidence, abuse of discretion, or a combination of the two. (See *In re K.P.* (2012) 203 Cal.App.4th 614, 621-622.) We need not weigh in on this debate as our conclusion is the same under any of these standards.

Ashley impliedly concedes that the children are adoptable, but asserts her parental rights should not have been terminated given the beneficial nature of her ongoing relationship with the children. In making this argument, she focuses on the fact that she continued unsupervised visitation with the children until the time of the section 366.26 hearing.

The juvenile court found that Ashley maintained regular and consistent visits with the children. The evidence supports this finding and the Agency does not challenge it. Regular visitation and contact, however, is only one prong of the analysis. The second prong involves examining whether the children would benefit from continuing the relationship. (§ 366.26, subd. (c)(1)(B)(i).) On this prong, Ashley must overcome the presumption in favor of adoption by showing her relationship with the children is such that the children will be greatly harmed by the termination of parental rights. (*In re Brittany C.*, *supra*, 76 Cal.App.4th at pp. 853-854.) The juvenile court found Ashley did not occupy a parental role with the children and the benefits of adoption outweighed any detriment the children would incur in terminating the relationship. After carefully reviewing the record we conclude that the juvenile court's findings are supported by substantial evidence and are not an abuse of discretion.

We note that Ashley has abused drugs for much of her life. During the first dependency proceeding she obtained sobriety, only to relapse after she gained custody of the children. At the time of trial, Ashley had been sober for about 22 months. While Ashley's efforts in obtaining sobriety are commendable, this is only one step toward being a good parent. It does not appear that Ashley has ever held a job or provided

financial support to the children.  Additionally, Ashley's housing situation remained unstable.  As of November 2013, Ashley had resided at a confidential domestic shelter for a period of four months; however, there were ongoing concerns about her ability to remain there due to lack of compliance with the program rules requiring her to find employment or attend school.  Ashley did enroll in a culinary skills class that was scheduled to begin in January 2014.  In May 2014, however, the court appointed special advocate (CASA) reported that Ashley's housing was again in jeopardy based on her failure to comply with the rules of the shelter.  At the time of trial, Ashley had been living with her brother for about a week.

This is not a case where Ashley presents a danger to her children.  It is undisputed that the children loved Ashley, enjoyed their visits with her and would be sad if the visits ended.  As Ashley noted, she had unsupervised time with the children every week.  Namely, K.J.G. visited with Ashley two days a week for four hours and on Fridays for the entire day.  Additionally, Ashley picked up K.G. on Friday afternoon and had both children on Fridays for five hours and on the weekends for seven hours each day.  Despite these frequent contacts, the social worker concluded the children did not have a strong attachment to Ashley, the children did not view Ashley in a parental role and Ashley's relationship with them was more akin with that of a big sister or youthful aunt.

At the time of trial, the children were about six and four years old and had each lived with the Cs for about half of their lives.  The CASA reported that the children appeared stable and to be thriving in their foster home.  She also noted that the children were very attached to the Cs and viewed them as authority figures.  The Cs had an

approved adoptive home study, expressed a commitment to adopting the children and indicated they would continue contact with the birth parents if they adopted the children. The foster mother reported that K.G. had expressed a lot of insecurity about leaving her foster home to live with Ashley, indicating K.G. wanted to stay with her and her husband as K.G. felt safer with them than with Ashley.

The social worker testified that the Cs' home was the only stable home the children have had and that the "security, comfort and permanency" provided by the Cs outweighed the detriment the children would incur if they lost contact with their birth parents. The CASA also stressed that the children needed permanency and stability, noting that after two years and despite the many resources provided to her, Ashley had not yet demonstrated that she could provide this for the children. "[D]elaying the selection of a permanent home for a child to see if a parent, who has repeatedly failed to reunify with the child, might be able to reunify at some future point, does not promote stability for the child or the child's best interests." (*In re Casey D.* (1999) 70 Cal App.4th 38, 47.)

While Ashley argues legal guardianship should have been selected as the children's permanent plan, the juvenile court is subject to the mandatory preference for adoption over legal guardianship. (§ 366.26, subd. (b)(1); *In re Fernando M.* (2006) 138 Cal.App.4th 529, 536.) Significantly, guardianship is only the best possible permanent plan for children in circumstances where the exceptions to terminating parental rights in section 366.26, subdivision (c)(1) apply. (*Fernando M.*, *supra*, at p. 536.) On this record, the juvenile court did not err when it determined that Ashley's relationship with the children did not place her within the beneficial relationship

7

exception.  Accordingly, the juvenile court correctly determined that adoption was the appropriate permanent plan for the children.

DISPOSITION

The orders are affirmed.

McINTYRE, J.

WE CONCUR:


HALLER, Acting P. J.


IRION, J.

8