27 Cal.App.4th 567 (1994)
32 Cal. Rptr.2d 535
In re AUTUMN H., a Person Coming Under the Juvenile Court Law.
SAN DIEGO COUNTY DEPARTMENT OF SOCIAL SERVICES, Plaintiff and Respondent,
v.
ALAN H., Defendant and Appellant.
Docket No. D020708.
Court of Appeals of California, Fourth District, Division One.
August 8, 1994.
*570 COUNSEL
Joseph T. Tavano, under appointment by the Court of Appeal, for Defendant and Appellant.
Lloyd M. Harmon, Jr., County Counsel, Susan Strom, Chief Deputy County Counsel, and Gary C. Seiser, Deputy County Counsel, for Plaintiff and Respondent.
Carol Archer, under appointment by the Court of Appeal, for Minor.
OPINION
WORK, J.
Alan H. appeals after the court changed his dependent daughter Autumn H.'s permanent plan from long-term foster care to adoption and terminated Alan's parental rights under Welfare and Institutions Code[1] section 366.26. Alan contends the exception to termination of parental rights in section 366.26, subdivision (c)(1)(A), is unconstitutionally vague because it does not define the word "benefit." Alan further contends there was substantial evidence showing his daughter derived benefit from continuing her relationship with him and no change of circumstances existed to warrant terminating his rights and changing the plan to adoption. We affirm the order.

FACTUAL AND PROCEDURAL BACKGROUND
Alan's four children were taken into protective custody on September 13, 1991, after Alan kicked three-year-old Stephen, causing head, facial and *571 back lacerations. Alan's wife Patricia,[2] seven-year-old Michelle and six-year-old Christine saw the kicking. The girls reported Alan hit them with a paddle. Autumn was then a year old.[3] The three older children were dependents of the court between 1988 and 1990 after Stephen's arm was nonaccidentally fractured. A son born during the first dependency died of sudden infant death syndrome at four months of age.
The court declared the children dependents a second time on October 2, 1991, finding Alan had inflicted serious physical harm on a child, Patricia had failed to protect the children and the children were at substantial risk of physical abuse. (§ 300, subds. (a) and (j).) The court placed Michelle and Christine with their maternal grandparents and Stephen and Autumn in foster homes. Alan's reunification plan included parenting classes, alcohol testing and counseling.
The parents did not successfully reunify with their children. Alan was incarcerated during most of the first six months of reunification, apparently as a result of kicking Stephen. Upon release, Alan entered a residential alcohol rehabilitation facility. He visited the children on a weekly basis. Alan was unemployed and lived on disability benefits for anxiety disorder. He experienced panic attacks. On November 25, 1992, the court terminated reunification services for Patricia after 12 months, but continued Alan's services for an additional 6 months.
At the 18-month review hearing on April 7, 1993, the social worker reported Alan wanted custody of the children but had a limited understanding of the children's day-to-day caretaking and emotional needs. Alan's counselor reported Alan made progress, but the counselor doubted Alan's commitment to reunification because Alan ceased attending alcohol abuse aftercare. The counselor thought Alan was not ready to care for the children, but unsupervised and overnight visits should be considered. The counselor commented "[M]y report speaks only to Alan's perspective, and that the children's long-term stability might well be more effectively served by a long term plan. However, I urge that some consideration be given to the possibility that Alan's changes will become permanent, and make him a serious option in his children's future." The court ordered the children's permanent plan to be long-term foster care.[4]

*572 Autumn

By October 5, 1993, the department of social services (Department) requested a selection and implementation hearing to change Autumn's permanent plan. Alan's counselor reported Alan was not able to care for Autumn on a full-time basis. Alan said he did not want to pursue reunification with Autumn because she was bonded with her foster family and would suffer if her placement were changed. Alan had been evicted from his home and lived with his girlfriend in a one-bedroom motel. He lost his Alcoholics Anonymous sponsor.
For five months the social worker urged Alan to follow a step-by-step process which would prepare Autumn for expanded visitation, but Alan did not make any attempt. He visited Autumn one hour per week but only once took her out of the foster home.
Autumn's developmental evaluation in April 1993 revealed she had made good progress in foster care. Autumn initially had low-muscle tone and was unable to walk until 15 months of age. Approaching three years of age, Autumn was outgoing, inquisitive and vivacious. She had excellent self-help abilities and a wide-ranging vocabulary. The evaluating psychologist noted Autumn's high activity rate may foreshadow hyperactivity or attention deficit disorder and Autumn "will continue to benefit by placement in a structured, stable home environment that can provide her with predictable routines."
Autumn's foster parents wished to adopt her and were willing to continue contact with her siblings and Alan. The court set a selection and implementation hearing on October 5, 1993.

Section 366.26 Hearing
Autumn's court-appointed special advocate (advocate) testified she observed four visits between Alan and Autumn. Alan allowed Autumn to do whatever she wished, including dangerous activities. He visited her 22 times in 1993. The advocate described Autumn's interaction with Alan "as with a family friend." The advocate did not think a strong bond existed between Autumn and Alan.
The social worker testified she initially recommended long-term foster care for Autumn because she believed Alan would "take the initiative to reunify." By October 1993, the social worker realized Alan had not developed a father/daughter relationship with Autumn. She thought Autumn enjoyed her visits with Alan.
*573 The foster mother testified Alan visited Autumn about half of the time offered. Alan did not ask the foster mother about Autumn but discussed his own personal problems. Autumn viewed Alan as a "play mate" and directed the activity between them. Autumn's sisters stayed with the foster mother on certain weekends and when the grandparents vacationed. The foster mother said she wanted to adopt Autumn and intended to continue contact with Autumn's birth relatives.
The adoptions social worker testified she did not feel it would be detrimental to Autumn to terminate Alan's parental rights. After observing Alan's visits with Autumn, the adoptions social worker believed Autumn thought of him not as a parent but as a "friendly visitor." The adoptions worker was of the opinion Alan did not have the capacity to form a parent/child relationship.
Alan testified Autumn referred to him as "Daddy Alan." He acknowledged there were times he should have set limits for Autumn but it was "tough" for him because they were trying to have a good time. Alan knew the social worker encouraged him to work toward overnight visits but he did not "see why there would be any reason for it."
On February 16, 1994, the court found by clear and convincing evidence Autumn was adoptable and it would not be detrimental to her to terminate Alan's parental rights. The court further found Alan did not have a father/daughter relationship with Autumn but a "friendly visitor" relationship, which would not preclude severing parental rights. The court severed Alan's rights and referred Autumn for adoptive placement.

DISCUSSION

Constitutionality
The avowed goal of dependency law is to protect children who are physically, sexually or emotionally abused, neglected or exploited. (§ 300.) Although the protection must focus on the preservation of the family whenever possible, the child who cannot be returned to his or her parent must be provided a stable, permanent home. (§ 366.25, subd. (a); § 366.26, subd. (b).) That child must be placed for adoption, in guardianship, or in long-term foster care. (§ 366.26, subd. (b).)
(1) Adoption, where possible, is the permanent plan preferred by the Legislature. (In re Heather B. (1992) 9 Cal. App.4th 535, 546 [11 Cal. Rptr.2d 891], citing the Sen. Select Com. on Children and Youth Rep. on Child *574 Abuse Reporting Laws, Juvenile Court Dependency Statutes and Child Welfare Services (1987-1988 Reg. Sess.) p. 11.) "Only if adoption is not possible, or if there are countervailing circumstances, or if it is not in the child's best interests are other, less permanent plans, such as guardianship or long-term foster care considered." (In re Brian R. (1991) 2 Cal. App.4th 904, 924 [3 Cal. Rptr.2d 768].) Adoption, of course, requires terminating the natural parents' legal rights to the child; guardianship and long-term foster care leave parental rights intact. After the parent has failed to reunify and the court has found the child likely to be adopted, it is the parent's burden to show exceptional circumstances exist. (Id. at pp. 923-924.)
The four situations to forego adoption and retain parental rights are where the court finds that termination would be detrimental to the minor due to one of the following circumstances:
"(A) The parents or guardians have maintained regular visitation and contact with the minor and the minor would benefit from continuing the relationship.
"(B) A minor 12 years of age or older objects to termination of parental rights.
"(C) The child is placed in a residential treatment facility, adoption is unlikely or undesirable, and continuation of parental rights will not prevent finding the child a permanent family placement if the parents cannot resume custody when residential care is no longer needed.
"(D) The minor is living with a relative or foster parent who is unable or unwilling to adopt the minor because of exceptional circumstances, which do not include an unwillingness to accept legal responsibility for the minor, but who is willing and capable of providing the minor with a stable and permanent environment and the removal of the minor from the physical custody of his or her relative or foster parent would be detrimental to the emotional well-being of the minor." (§ 366.26, subd. (c)(1).)
(2a) Alan contends the "benefit from continuing the relationship" exception to terminating parental rights is unconstitutionally vague because it fails to set forth guidelines on the type or extent of the "benefit" the parent must prove. He claims the vagueness confers unreasonable discretion on the trial judge, creating the danger of arbitrary and discriminatory enforcement.
(3) "As a matter of due process, a law is void on its face if it is so vague that persons `of common intelligence must necessarily guess at its meaning *575 and differ as to its application.' Such vagueness occurs when a legislature states its proscriptions in terms so indefinite that the line between innocent and condemned conduct becomes a matter of guesswork." (Tribe, American Constitutional Law (2d ed. 1988) § 12-31, p. 1033, fn. omitted.) The person challenging a statute as vague must ordinarily show he or she is one of the "entrapped innocent" and it would have been practical for the Legislature to draft more precisely. (Ibid.)
(2b) We find no reported cases addressing the standard a court must use in determining if a parent/child relationship should continue under the section 366.26, subdivision (c)(1)(A) exception. A finding no exceptional circumstance exists is customarily challenged on the sufficiency of the evidence. (See In re Jesse B. (1992) 8 Cal. App.4th 845, 851 [10 Cal. Rptr.2d 516]; In re Brian R., supra, 2 Cal. App.4th 904, 924.) We therefore treat the question as one of first impression.
In the context of the dependency scheme prescribed by the Legislature, we interpret the "benefit from continuing the [parent/child] relationship" exception to mean the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated.
(4) Interaction between natural parent and child will always confer some incidental benefit to the child. The significant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation. (See Goldstein et al., Beyond the Best Interests of the Child (1973) p. 17.) The relationship arises from day-to-day interaction, companionship and shared experiences. (Id. at p. 19.) The exception applies only where the court finds regular visits and contact have continued or developed a significant, positive, emotional attachment from child to parent.
At the time the court makes its determination, the parent and child have been in the dependency process for 12 months or longer, during which time the nature and extent of the particular relationship should be apparent. Social workers, interim caretakers and health professionals will have observed the parent and child interact and provided information to the court. The *576 exception must be examined on a case-by-case basis, taking into account the many variables which affect a parent/child bond. The age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs are some of the variables which logically affect a parent/child bond.
(2c) We conclude the meaning of section 366.26, subdivision (c)(1)(A) is clear and it would not have been practical for the Legislature to draft the statute more precisely.

Sufficiency of the Evidence
(5a) Alan next argues the evidence shows Autumn would benefit from continuing her relationship with him and there was insufficient evidence to terminate his rights and change Autumn's permanent plan to adoption. (6) On review of the sufficiency of the evidence, we presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order. (In re Tracy Z. (1987) 195 Cal. App.3d 107, 113 [240 Cal. Rptr. 445]; 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 278, p. 289.)
(5b) At the time of the selection and implementation hearing, Autumn was three and one-half years old. She had been removed from Alan's custody two and one-half years earlier. The social workers and foster mother uniformly characterized Alan's relationship with Autumn as that of a "friendly visitor" and "family friend." Alan conceded Autumn was bonded to her foster family and would suffer if she were disrupted. His relationship with Autumn consisted of visiting to play with her for approximately an hour every other week. He was unable to set limits for her.
Autumn's developmental report indicated Autumn had a greater than average need for a structured home environment with predictable routines because of her high activity level. Substantial evidence supports the court's finding terminating the relationship between Alan and Autumn would not be detrimental to her because the relationship was one of friends, not of parent and child. Autumn had been a dependent for three-quarters of her young life and needed a stable, permanent home. The court properly concluded no exceptional situation existed to forego adoption.
Circumstances did change from the time of the long-term foster care order in April 1993 and the selection and implementation hearing in February *577 1994. The long-term foster care order envisioned expanded visitation and active parenting by Alan. However, Alan did not follow through, his housing was not suitable and Autumn's need for stability because of her high activity level became known. It was undisputed Autumn was bonded to her foster family and the family wanted to adopt her. When a child is in long-term foster care and the court has not dismissed jurisdiction, the appropriateness of placement and the progress made to provide a permanent home must be regularly assessed. (§ 366.3.) Here substantial evidence supports the order terminating Alan's parental rights and freeing Autumn for adoption.

DISPOSITION
Order affirmed.
Kremer, P.J., and Froehlich, J., concurred.
Appellant's petition for review by the Supreme Court was denied October 27, 1994.
NOTES
[1] All statutory references are to the Welfare and Institutions Code unless otherwise specified.
[2] Patricia did not reunify with the children and does not appeal.
[3] Autumn was born on August 25, 1990.
[4] The grandparents were later granted guardianship of Christine and Michelle and Alan did not appeal that order. Stephen remains in long-term foster care.