Filed 11/30/15  In re Caleb B. CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re CALEB B. et al., Persons Coming Under the Juvenile Court Law. | B264898 (Los Angeles County Super. Ct. No. CK98073) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> J.L., <br><br> Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Stephen Marpet, Juvenile Court Referee.  Affirmed.

David A. Hamilton, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, Interim County Counsel, Dawyn R. Harrison, Assistant County Counsel, Peter Ferrera, Deputy County Counsel, for Plaintiff and Respondent.

_____

The juvenile court terminated the parental rights of J. L. (Mother) to her son and daughter. (Welf. & Inst. Code, § 366.26.)[1] The court did not abuse its discretion by denying Mother's requests for a contested hearing or a continuance. We affirm.

## FACTS

Mother's children are Caleb (born in 2010) and Shelby (born in 2012). In February 2013, when Caleb was two years old and Shelby was four months old, a report was received by the Department of Children and Family Services (DCFS), alleging that Mother and the children's father E.B. (Father) use drugs and lack stable housing.[2] Father was recently arrested for domestic violence after kicking and punching Mother so severely that he ruptured her spleen. Father told Mother not to seek medical treatment "because he did this to me and he does not want to get in trouble." A week later, the paramedics fetched Mother because she was in so much pain. She was hospitalized and Father was incarcerated when the children were detained.

Mother and Father have been together since 2009. When Mother was pregnant with Caleb, Father pushed her. The police came and arrested Father. Mother said that in 2012 Father "pushed me around and slapped me while I was lying in bed next to Shelby," three days after Shelby was born. Father calls Mother "degrading names" in front of the children and verbal arguments between the parents occur "at least once a week."

When asked about substance abuse, Mother indicated that she and Father "use together" since 2009; the drug they use is methamphetamine (meth). "Mother stated that she smokes meth about twice a week," in the bathroom of the paternal grandparents' (PGPs) home, while the children are in the living room. Mother claims that she stopped using meth while pregnant, then began again after the children were born. After ingesting meth, Mother washes up, then tends to the children while under the influence.

---

[1] All statutory references in this opinion are to the Welfare and Institutions Code.

[2] Father is not a party to this appeal

When told that the children were being placed with the PGPs, Mother said, "I wouldn't want them to go anywhere else."

Father accused Mother of lying that he ruptured her spleen, claiming that she injured herself in a fall. He has never put his hands on her "other than grabbing her face," and restraining her from biting, scratching and hitting him. He told the social worker, "Mother is a thirteen year user of meth so she shows signs of hallucination, paranoia, and lying." Father used meth consistently with Mother but recently stopped "because I was going to jail so much." Father saw a text message from a drug dealer threatening to "beat the mother like a man" because she owes the dealer money. Mother "slams meth," meaning that she injects it into her veins, which leaves marks on her arms and causes her to black out. Father is aware that Mother obtained a restraining order against him when he was arrested for domestic violence in 2011, but "we still were seeing each other and I was seeing the kids."

The paternal grandfather (PGF) recently found a glass pipe with yellow-brown residue under the parents' mattress. When confronted, Father was silent, and the PGF smashed the pipe right in front of Father. The PGF also found a plastic bag with white rocks inside and text messages relating to drug pickups. He tried to help Mother "by taking her to sign up for rehab but it didn't work." The paternal grandmother (PGM) believes that Father started using "crack" three years ago: he admitted to her that he is a "drug addict." The PGM found a glass pipe in Mother's belongings. Mother "does not act like a mother" and "stays in the bedroom most of the time."

The PGF intervened in daily verbal fights between Mother and Father. Although the PGPs have not seen physical fights, "we know they do," as they observed both Mother and Father with scratches or marks. The PGPs purchase diapers and other items for the children because the parents do not. The paternal aunt often sees Mother outside the PGPs' home with the children, waiting for Father in the cold. One evening in December 2012, Father's family sought to bring the children inside the house at 11:00 at night; Mother told them she thought that it was 6:00 p.m., then drove away with the children. Mother never looks the paternal aunt in the eye or has a normal conversation,

3

rambling as she speaks; she sleeps all day and the paternal relatives have to supervise and care for the children.

Mother and Father have extensive criminal histories, largely involving possession of drugs or paraphernalia, or being under the influence of drugs. Mother had convictions in 2000, 2005, 2006, 2007, 2008, 2009, and 2012. In light of current parental drug abuse and domestic violence, DCFS deemed the children to be at "high" risk.

DCFS filed a petition alleging that the children are at risk of serious physical harm owing to Father's violent attack on Mother, which resulted in a ruptured spleen and hospitalization. The parents failed to protect the children by engaging in violent altercations, and because Mother uses illicit drugs and tended the children while under the influence. An amendment alleges that Father has a history of illicit drug use that prevents him from caring for the children.

The parents denied the allegations in the petitions. On March 1, 2013, the court found a prima facie case for detaining the children, who were placed in the home of the PGPs under DCFS supervision. The parents were given reunification services (domestic violence counseling, weekly random drug testing, substance abuse counseling and parenting counseling) and monitored visits.

In the jurisdiction/disposition report, Mother reiterated that Father punched and kicked her, rupturing her spleen. She was hospitalized for two weeks. The PGM urged Mother to stay away from the PGPs' home to avoid a subpoena in Father's criminal case. Mother went home, was served with a subpoena, and testified against Father, who was previously arrested for domestic violence in 2011 and 2012.

Mother began using meth in 1990. After a rehab program in 2002, Mother was sober for a year, then returned to her old job and friends, and began using meth until she became pregnant with Caleb. She resumed drug use after his birth, until learning that she was pregnant again. After a miscarriage, she used meth almost daily until becoming pregnant with Shelby. She began using again two weeks after Shelby's birth.

Mother met Father through drug-using friends. He was the drug supplier. They smoked meth together at the PGPs' home. Father has used drugs for a long time, and the PGPs allowed him to use their phone for drug transactions.

Father continued to accuse Mother of instigating domestic violence against him, and denied injuring Mother. He said that Mother was "slamming" and "eating" meth, using it every day, even during her pregnancies. "If she wasn't high, she'd be sleeping or going out to get the drugs. She wasn't functional." Father admitted that "I do have a drug problem," which he plans to address in rehab upon his release from jail. Father used drugs sporadically for four years, then met Mother "at a dope house," and they began using meth daily. Father was "discreet" in smoking meth in the bathroom before putting the drugs away to "go take care of the kids."

The PGF noted that Father and Mother "were always fighting," except "when they were on a low from their high," which made the PGF concerned for the children's safety. The PGF knew about parental drug abuse and saw photos and videos Mother and Father took of themselves while using drugs. Nevertheless, the PGF did not evict Mother and Father from his home "for the kids. I didn't want them out on the streets, sleeping in a car." The PGPs provide most of the caregiving for the children, as Mother usually sleeps. The parents are not responsible, leaving the children without making arrangements for child care. Following an examination of Shelby, a physician suspected that she had prenatal drug exposure.

Despite Father's claim that Mother injured herself in a fall, the spleen only ruptures when there is "a severe direct blow or blunt trauma," usually from a car accident or domestic violence. When admitted to the hospital, Mother had bruises on her thighs, ankle, knees and wrist. Mother began random drug testing and tested positive for meth and amphetamines on April 3 and 25, 2013.

Mother and Father waived their right to trial and submitted on the petition and the DCFS reports. On May 13, 2013, the court sustained allegations that Mother and Father have a history of engaging in violent altercations in the children's presence, including a fight in which Mother was struck, fell to the floor and was later hospitalized for a

ruptured spleen. Mother failed to protect the children by remaining with Father despite a restraining order against him. Mother and Father endangered the children by supervising them while under the influence of meth.

Moving to disposition, the court found a substantial danger to the children's health and no means to protect them without removal from parental custody. The court ordered reunification services. Mother must participate in individual counseling; a 12-step program with a sponsor; parenting classes; a domestic violence program; weekly alcohol counseling and testing; and a drug program with weekly random drug testing. The parents may have monitored visits.

In December 2013, DCFS reported that the children remain at the home of the PGPs, who meet their physical and emotional needs. Mother enrolled in an inpatient drug program in October 2013, five months after disposition. Mother sees the children every Sunday from noon to 5:00 p.m., monitored by an aunt who stated that the children are very bonded to Mother, who feeds them and changes diapers.

Before entering an inpatient drug program, Mother failed to show up for 19 random drug tests. Upon entering the program, she tested positive for meth and marijuana. Thereafter, she had negative drug tests, participated in group sessions on "chemical dependence, relapse prevention, anger management, living in balance, seeking safety, making alcoholics anonymous easier, like skills, parenting and child care skills." She attended individual weekly therapy with a licensed clinician and a 12-step program.

In March 2014, one year after the detention hearing, the court gave Mother additional reunification services. It authorized Mother to have unmonitored visits with the children at her inpatient drug program. Mother had 34 negative drug tests since entering the program. In April 2014, Mother graduated from the program and enrolled in an outpatient rehab program. She completed a domestic violence course and parenting classes. In June 2014, DCFS liberalized Mother's visits, allowing her to see the children twice per week without a monitor.

Mother's sobriety was short-lived. She missed a drug test on July 28, 2014, then tested positive for meth and amphetamines on August 11, 2014. DCFS promptly

6

reinstated monitoring for Mother's visits. DCFS reported that Mother's demeanor changed suddenly. While sober, she was kind and cordial with social workers. On August 11, she was rude, angry, cursed, and hung up the telephone on the social worker. When confronted, Mother diminished the significance of her relapse. Her behavior showed the impact of drugs on Mother's emotions and her interactions with others. Mother did not provide DCFS with proof of enrollment in individual counseling.

The children continued to do well in the home of the PGPs, who are willing to adopt them. The PGF took Caleb to counseling to address aggressive behavior and tantrums. Father did not complete any court-ordered programs. Given the parents' inability to show that they can maintain a drug-free, safe and stable environment for the children, DCFS recommended that the court terminate reunification services. The court set a contested hearing on the recommendation. Shortly before the contested hearing, DCFS reported that Mother did not enroll in a drug program and missed two random drug tests in September and two drug tests in October 2014. She claimed to be attending NarcAnon meetings, but did not provide the location or contact information for her sponsor. Mother is taking medication for bipolar disorder but is not seeing a psychiatrist.

After a hearing on November 7, 2014, the court found that Mother and Father partially complied with the case plan, but their 18 months of services have lapsed. Return of the children to the parents would likely result in severe physical or emotional harm. The court terminated reunification services and set a permanent plan hearing for March 4, 2015.

DCFS submitted a report for the permanent plan hearing. The prospective adoptive parents are the PGPs, who have been married for 36 years and are committed to raising their grandchildren. The PGM works while the PGF is a full-time homemaker. The PGF monitors Mother's consistent, twice weekly visits, which he described as being of high quality. The children are very bonded to the PGPs.

In May 2015, Mother requested a modification, seeking six months of reunification services, unmonitored or overnight visits, or return of the children to her care. Mother stated that she is sober, attends NarcAnon daily, and she claimed to have

7

completed a counseling and drug testing program at Foley House from November 20, 2014 to February 25, 2015. She submitted a letter from Foley House, signed by "Jo Anne Ramirez" attesting to Mother's successful completion of a program. Mother described her relapse as "very brief" and "understandable." She has a significant bond with the children, whom she visits consistently. Mother stated that she "has fully dealt with the issues that led to her children being removed from her care" and demonstrated that they can safely be returned to her. The court ordered a hearing on Mother's modification request.

DCFS sought further information regarding Mother's drug program and sobriety. Mother submitted a second letter dated May 28, 2015, purporting to be from Jo Anne Ramirez at Foley House: the letter states that all of Mother's drug tests were negative and Mother is participating in counseling. The caseworker tried to contact Jo Anne Ramirez, without success. A call to Foley House revealed that no person of that name works at the facility. DCFS sent a copy of the purported progress letter to Foley House, whose director called to say that the letter "was a complete counterfeit and that they didn't have said counselor at their facility." Because Mother was untruthful about Foley House, her claimed attendance at NarcAnon was dubious, especially since Mother could not identify a sponsor's phone number even though the sponsor is supposed to be someone she can reach whenever there is a possible relapse.

The PGPs provide the children with love, stability, security and encouragement, and want to provide them with a permanent home through adoption. While Mother visits regularly, at times she leaves early or is unwilling to help the PGPs bathe the children and put them to bed. DCFS recommended that the court deny a modification because Mother has not made the necessary changes and instead engaged in counterfeiting to deceive DCFS and the court into thinking that she is compliant.

At the permanent plan hearing on June 3, 2015, Mother had a new attorney from the same law firm as her prior attorney. He requested a contest, citing Mother's "updated progress letter" from Foley House. Because he was unaware of the DCFS report showing that the letter is a counterfeit, the court continued the hearing to the afternoon, so counsel

8

could read the reports and prepare. When the hearing resumed, counsel again asked for a contest because Mother "has been visiting. Visits have been going well." The court replied that Mother had two months of unmonitored visits in 2014, then relapsed and has been monitored ever since, so she "never entered into a parental role" sufficient to support an exception to the termination of parental rights. The court denied Mother's petition for modification because it was not in the children's best interests, and denied a contested hearing.

The court found it "extremely disturbing" that Mother attempted to deceive the court by submitting fraudulent progress reports. Over Mother's objection that she has a bond with the children, the court found it likely that the children will be adopted by the PGPs, and terminated parental rights. Mother appeals.

## DISCUSSION

### 1. Denial of a Contested Permanent Plan Hearing

Mother contends that her rights were prejudiced because the juvenile court refused to set a contested permanent plan hearing. We note at the outset that the court terminated Mother's reunification services on November 7, 2014, and set a permanent plan hearing for March 4, 2015. The hearing was continued until June 3, 2015, while Mother ostensibly gathered evidence to prove her sobriety and the existence of a beneficial parental relationship. Not once between November 7, 2014 and June 3, 2015, did Mother request a contest, until the moment she appeared. Mother had notice and a seven-month opportunity to fully prepare for the hearing. Due process was amply satisfied.

At the selection and implementation hearing, the court must terminate parental rights if it finds that the child is likely to be adopted. (§ 366.26, subd. (c)(1); *In re Celine R.* (2003) 31 Cal.4th 45, 49; *In re S.B.* (2009) 46 Cal.4th 529, 532.) Adoption is the permanent plan preferred by the Legislature. (*In re Derek W.* (1999) 73 Cal.App.4th 823, 826; *In re Ronell A.* (1995) 44 Cal.App.4th 1352, 1368.)[3]

---

[3] Mother does not dispute that the children are likely to be adopted.

9

At the hearing, Mother asserted the "benefit to the child" exception to the legislative policy favoring adoption. A parent may avoid termination of parental rights by showing that it would be detrimental to the child. (*In re Celine R.*, *supra*, 31 Cal.4th at p. 53.) There must be "regular visitation and contact" with the children, who "would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)

Mother argued that she "has been visiting. Visits have been going well" and also that "there is a bond that exists between her and the children." Evidence of Mother's consistent visits with the children was sufficient to satisfy the first prong of the statutory exception. The problem is that Mother cannot show a parental relationship that outweighs the benefit of a permanent adoptive home.

This dependency case began in February 2013, when Caleb was two years old and Shelby was four months old. Parental rights were terminated in June 2015. During that entire time, Mother had unmonitored visits for only two months before relapsing into drug use. Though she claimed sobriety following her inpatient drug rehab program, Mother's submission of counterfeit "proof" of clean drug tests, twice, leads ineluctably to the conclusion that she is abusing drugs. If Mother were truly clean, there would be no need for her to submit false evidence. Mother did not progress over the course of the dependency proceeding; rather, she regressed after a six-month inpatient program.

Given Mother's intractable 25-year addiction to meth, she is unable to have unmonitored, weekend or extended visits, let alone custody of the children. The juvenile court found that Mother "never entered into a parental role" due to the monitoring requirement. At a contested hearing, Mother could not prove that she occupies a parental role for the children: she is incapable of parenting owing to her meth addiction. (*In re Brittany C.* (1999) 76 Cal.App.4th 847, 853-854.) She could not show that the children would be greatly harmed by termination of parental rights because she has not "advanced beyond supervised visitation." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 51.) A true parental relationship does not require a third party to monitor parent-child visits.

Though Mother argues that she has consistently visited and the visits went well, even frequent and loving contact between parent and child is not sufficient to establish

the requisite benefit to the child if Mother is unable to take custody. (*In re Teneka W.* (1995) 37 Cal.App.4th 721, 728; *In re Josue G.* (2003) 106 Cal.App.4th 725, 732; *In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418-1419.) A relationship that is "pleasant" is not enough to establish a benefit to the child because "it bears no resemblance to the sort of consistent, daily nurturing that marks a parental relationship." (*In re Derek W.*, *supra*, 73 Cal.App.4th at p. 827.) "Interaction between natural parent and child will always confer some incidental benefit to the child." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.)

The PGPs have been the children's lifelong caregivers. Even when Mother had custody, before the children were detained, she did not act in a parental manner, sleeping all day, using meth at home and fighting with Father in the children's presence, and interacting with the children while under the influence. She did not arrange for the children's care, and simply assumed that the PGPs would do all of the parenting for her. Mother has been arrested repeatedly as a result of her addiction.

Apart from the incidental benefit of parent-child interaction, we must consider "the many variables which affect a parent/child bond. The age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs are some of the variables which logically affect a parent/child bond." (*In re Autumn H., supra*, 27 Cal.App.4th at p. 576.) Caleb and Shelby have spent the majority of their young lives with the PGPs as their sole, full-time caregivers. They know Mother from weekly visits, not as someone who tends to their needs on a daily basis. The record shows that Mother leaves visits early and is unwilling to bathe the children or put them to bed. Mother does not dispute that the children are thriving in their placement.

Under the circumstances, the juvenile court was not required to conduct a contested hearing on the exception to termination of parental rights. (*In re Tamika T.* (2002) 97 Cal.App.4th 1114, 1122; *In re Earl L.* (2004) 121 Cal.App.4th 1050, 1053.) Mother offered to prove regular visitation and an emotional bond, a matter that was uncontroverted. This is not enough. Mother did not propose to present the testimony of

11

any witness that the children would be "greatly harmed" by termination of her parental rights. (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) Moreover, any evidence Mother might present was irrelevant in the face of her continuing 25-year meth addiction and resulting inability to have unmonitored visits or to take custody, now or in the foreseeable future.

Where, as here, the children are likely to be adopted, the court must choose adoption to give them "the most permanent and secure alternative that can be afforded them." (*In re Beatrice M.*, *supra*, 29 Cal.App.4th at p. 1419.) There was no prejudicial error in denying a contested hearing and terminating parental rights.

## 2. **Denial of a Continuance**

Mother did not request a continuance below. Her attorney said, after his request for a contest was denied, "if the court is inclined to go forward today, then I guess that's what we're doing." The issue of a continuance was forfeited.

Continuances are disfavored in dependency cases. (*In re David H.* (2008) 165 Cal.App.4th 1626, 1635.) Children are entitled to a prompt resolution of their custody status and a stable placement. (*In re Giovanni F.* (2010) 184 Cal.App.4th 594, 604-605.) "[P]roviding children expeditious resolutions is a core concern of the entire dependency scheme." (*Tonya M. v. Superior Court* (2007) 42 Cal.4th 836, 847, fn. 4.)

A continuance may be granted for good cause but must be denied if contrary to the interests of the children. A written request for a continuance must be filed at least two court days before the hearing, "together with affidavits or declarations detailing specific facts showing that a continuance is necessary," unless the court entertains an oral motion for continuance. (§ 352, subd. (a).) The denial of a continuance is reviewed for an abuse of discretion. (*In re Giovanni F., supra,* 184 Cal.App.4th at p. 605.) Discretion is abused "when a decision is arbitrary, capricious or patently absurd and results in a manifest miscarriage of justice." (*In re Karla C.* (2003) 113 Cal.App.4th 166, 180.)

For the reasons set forth in section 1, *ante,* no continuance was justified, even if Mother had requested one. Mother was only trying to delay the inevitable outcome of an

12

order terminating parental rights, because the two-and one-half-year history of this case does not support a departure from the legislative policy favoring adoption.

## **DISPOSITION**

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


BOREN, P.J.

We concur:


ASHMANN-GERST, J.


CHAVEZ, J.