Filed 12/11/15  In re Trinity M. CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re TRINITY M. et al., Persons Coming Under the Juvenile Court Law. | B264832 |
| | (Los Angeles County Super. Ct. No. CK94068) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| M.O., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Victor Greenberg, Judge.  Affirmed.

Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, Interim County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Jessica S. Mitchell, Deputy County Counsel, for Plaintiff and Respondent.

_____

## INTRODUCTION

Mother M.O. appeals the termination of her parental rights as to her daughters, Trinity and Tatiana, arguing that the juvenile court erred in failing to apply the parent-child beneficial relationship exception to the termination of her parental rights, set forth in Welfare and Institutions Code[1] section 366.26, subdivision (c)(1)(B)(i). The record indicates that Mother relapsed in methamphetamine use, was arrested for intent to sell a controlled substance, was incarcerated multiple times during the dependency case, continued to associate with Father despite their emotionally detrimental relationship and history of domestic violence, violated the juvenile court's visitation orders, and failed to obtain stable housing over the course of this lengthy dependency case. We affirm because substantial evidence supported the juvenile court's determination that a continuing relationship with Mother would be detrimental to the children.

## FACTS AND PROCEDURAL BACKGROUND

Prior to June 2012, Trinity (born in March 2007) and Tatiana (born in November 2008) lived with Mother and Father. The family came to the attention of the Department of Children and Family Services (DCFS) in June 2012 based on allegations of child neglect, drug sales, and drug use occurring within the family home. During DCFS's investigation, Mother tested positive for amphetamine and methamphetamine, and admitted to using drugs. Mother admitted that she started using methamphetamine in 2004, and began but failed to complete a drug treatment program years ago. Mother stated that she relapsed on June 11, 2012, and used the drugs to relieve pain and to stay awake when caring for the children. Father also acknowledged his drug use. Both parents admitted that they had criminal histories with arrests and convictions related to drugs. The parents verbally consented to DCFS detaining the children. On June 22, 2012, the juvenile court ordered the children to be detained, and they were placed in foster care.

---

[1] All further statutory references are to the Welfare and Institutions Code, unless otherwise indicated.

#### a. *Jurisdiction*

One month later, the juvenile court sustained the section 300 petition, under subdivision (b), finding true the allegations regarding Mother's history of illicit drug use, her current abuse of methamphetamine and amphetamine, and Father's history of illicit drug use, all of which rendered the parents incapable of providing the children with regular care and supervision. The court granted the parents monitored visitation and ordered the parents to participate in parenting classes, drug and alcohol programs, drug testing, and individual counseling.

#### b. *Mother's Instability*

Although the parents completed a 52-week program for domestic violence, drug education, relapse prevention, parenting classes, and individual sessions in June 2013, and Mother enrolled in six months of aftercare for her drug abuse, problems persisted. Mother missed many drug tests in 2013 and 2014. DCFS continued to have concerns regarding Mother based on her financial issues, unstable housing situation, and emotionally damaging relationship with Father. Namely, Mother's car was impounded, she moved several times within a short period of time, one of the homes she resided in was raided and resulted in her incarceration, and in August 2013, she was staying at the home of a man with an open DCFS case.

DCFS noted that Mother was most debilitated by her inability to disconnect from Father, who recently cheated on her and with whom she had a history of domestic violence. Mother's relationship with Father had an extremely negative impact on her functioning and caused her depression. Mother also continued to deny that she and Father were involved in domestic violence even though Tatiana reported that she had witnessed the violence and physical threats. Despite the fact that there was a criminal restraining order mandating that Father stay away from Mother, the parents were found together when Mother was pulled over for driving with expired tags and without a license, and when the parents visited Trinity at school in violation of the court's visitation orders.

DCFS explained that although the parents appeared to love their children and have a strong connection with them, "both parents are extremely immature, continue to make unwise decisions and [Mother] continues to allow [Father] to play games with her." DCFS assessed that it was not safe to return the children to the parents' care given Mother and Father's recent incarcerations, Mother's unstable housing, Mother's imprudent decisions to reside in unsuitable residences, and her unwise decision to remain with Father.

### c.    Monitored Visitation

Visitation and the reunification services went well at the beginning of the case, and DCFS liberalized Mother's visits to be unmonitored in October 2012. However, on January 29, 2013, the parents were arrested for outstanding traffic warrants and for possession of controlled substances with intent to sell. Mother was placed on probation for three years for possession of a controlled substance with intent to sell. Subsequently, on January 31, 2013, the court ordered for all visits to again be monitored.

In the latter part of this three-year-long dependency case, the parents frequently arrived late or failed to show up to monitored visitation. Mother also showed up at Father's scheduled visiting days despite the fact that she knew of the restraining order. In May 2014, Mother decided to move to Texas to look for work. She returned in July 2014, after missing a couple of months of visitation with the children. In late July 2014, Mother was incarcerated in a federal prison for several months.

### d.    Impacts on the Children

Mother's inconsistent visitation with the children due to her failure to show up to scheduled visits, her sudden move to Texas, and her four-month incarceration negatively affected and stunted the children's psychological and emotional development. While Mother was incarcerated, "the children displayed parentified concerns for their mother's well being asking her over the phone if she had food, and clean clothes." From 2014 to 2015, the children's behaviors were "very dysregulated." They struggled with academic issues and emotional breakdowns at school. Trinity had emotional breakdowns at the doctor's office and expressed fear of moving again to another foster home. During visits

4

with Mother, the children appeared emotionally dysregulated, displayed attention seeking behavior (e.g. yelling loudly, lying, and being physically extremely hyperactive), and acted in an aggressive and immature manner, often regressing to a baby-like state.

Earlier in this dependency case, the children had become increasingly violent in the foster home and had even struck a foster parent's own children. The children's therapist reported the children's aggressiveness and feelings of anger were a product of witnessing crimes in the home and the children were working to reduce their tantrums and aggressive behavior in therapy. Fortunately, these behaviors generally disappeared when the children received a stable placement and were interacting with their prospective adoptive parents (the exception to this change in behavior being during visitation). Both girls had "extremely complex educational, behavioral, and emotional needs all which require[d] constant attention and follow up." Under the care of the prospective adoptive parents, these needs were being satisfied, as reflected by the significant improvements in the children's grades and behavior.

Both children expressed their continued and positive interest in being adopted. The children developed a good relationship with their prospective adoptive family and began calling their prospective adoptive parents "mom" and "dad." The children were given their own room and perceived the adoptive home as their own.

Nonetheless, continued visitation with Mother and Father caused confusion for the children, who were torn by their loyalty towards their birth parents and their desire to be adopted and belong to a stable, loving family. During one visit, Mother scolded the children for calling the prospective adoptive parents "mom" and "dad." The children's dispositions made it apparent that the visits with Mother and Father caused the children distress. The children's behavior would noticeably shift the day before a visit, with Tatiana exhibiting attention-seeking behavior and Trinity becoming very quiet. DCFS noted that Trinity's emotional attachment to Mother diminished in the latter half of the dependency case. In sum, the continued visitation caused the children confusion about permanency and stability.

5

*e.     Termination of Parental Rights*

In May 2015, the juvenile court convened the section 366.26 hearing.  DCFS entered its reports into evidence, documenting the facts described above.  Mother's counsel called the children, the foster care case manager, and Mother to testify.  The children indicated they wanted to live with Mother again.  The foster care manager testified that the Mother had a strong bond with the children and that she would describe Mother's role in their lives as a mixture of a friend and a mother.  Mother testified about her relationship and interactions with the children, and her involvement in their medical care and schooling.  Evidence also came before the court indicating that Mother coached the children on the phone prior to the hearing to say they wanted to return to her care.[2]

DCFS and the children's counsel both requested the court find the children to be adoptable, and terminate parental rights, finding that no exception to termination applied given the parents' failure to reunify with them during the three years of DCFS's involvement.  Mother's and Father's counsel requested the court find that the parent-child beneficial relationship exception to termination of parental rights applied.

The court found that "the minors are very affectionate and love their parents and enjoy seeing them.  However, the extent of that bond is somewhat muddied by the evidence before the court that the mother was heard . . . on a phone call to the minor, coaching the minor regarding whether they would want to be returned."  The court noted that the children's negative behavior during visits with the parents, and that Mother left the children to briefly move to Texas to look for work did not strengthen her claim of maintaining a parental role in their lives.  The court stated that Mother failed to have day-to-day contact with the children "essentially because, having never rehabilitated, the visitation continues to be monitored for a lengthy period of time."  The court found that

---

[2]     We note that this is not the only occasion documented in the record, where Mother coached the children to tell authority figures something.  On another occasion, when Mother visited Trinity at school in violation of the court's visitation orders, Mother became upset when Trinity told her foster parent that Mother had visited her, scolded Trinity for lying, and told Trinity to deny that Mother visited her at school.

the parents had not "fulfilled their parental roles" and that the children would not benefit from continuing the relationship with the parents. The court further stated that its decision was supported by a statement made by the children, which was recorded within DCFS's documents, indicating that if they are unable to reunify with the parents, they would prefer adoption. Based on the foregoing, the court found that the beneficial parent-child relationship exception did not apply, and terminated the parents' parental rights.

## DISCUSSION

It is undisputed that the children were adoptable. Mother argues that her parental rights were wrongfully terminated because the court erred in failing to apply the parent-child beneficial relationship exception to the termination of her parental rights. "On appeal, we review the factual basis for the trial court's finding of adoptability and termination of parental rights for substantial evidence." (*In re Josue G.* (2003) 106 Cal.App.4th 725, 732 (*Josue G.*).) We "presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576 (*Autumn H.*).) If, on the entire record, there is substantial evidence to support the findings of the juvenile court, we uphold those findings. The parent has the burden of showing that there is no evidence of a sufficiently substantial nature to support the finding or order. (*In re L. Y. L.* (2002) 101 Cal.App.4th 942, 947.)

"The selection and implementation hearing under section 366.26 takes place after the juvenile court finds that the parents are unfit and the child cannot be returned to them." (*Josue G., supra,* 106 Cal.App.4th at p. 732.) At this stage, "the juvenile court [is] left with three alternatives: adoption, guardianship or long-term foster care." (*In re Teneka W.* (1995) 37 Cal.App.4th 721, 728.) "Adoption, of course, requires terminating the natural parents' legal rights to the child; guardianship and long-term foster care leave parental rights intact." (*Autumn H., supra,* 27 Cal.App.4th at p. 574.) Adoption is the preferred permanent plan for the children. (*In re Marina S.* (2005) 132 Cal.App.4th 158,

7

164.)  "If a child is likely to be adopted, parental rights must be terminated unless one of several enumerated exceptions applies." (*Ibid.*)  "After the parent has failed to reunify and the court has found the child likely to be adopted, it is the parent's burden to show exceptional circumstances exist." (*Autumn H.,* at p. 574.)

At issue is whether substantial evidence supports the court's determination that the beneficial parent-child relationship exception set forth in 366.26, subd. (c)(1)(B)(i) did not apply.  Subdivision (c)(1)(B) provides that the juvenile court shall not terminate parental rights when the court finds that one or more of six enumerated circumstances exist to establish that there is "a compelling reason for determining that termination would be detrimental to the child." (§ 366.26, subd. (c)(1)(B).)  The beneficial parent-child relationship is one of these enumerated circumstances.  The beneficial parent-child relationship exists where "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)  In sum, Mother needed to demonstrate two elements:  (1) that she had a parent-child relationship evidenced by regularly visiting and contacting the children, and (2) that the children would benefit from a continuing relationship with her.

We have previously explained that, "To overcome the preference for adoption and avoid termination of the natural parent's rights, the parent must show that severing the natural parent-child relationship would deprive the child of a *substantial*, positive emotional attachment such that the child would be *greatly* harmed.  [Citations.]  A biological parent who has failed to reunify with an adoptable child may not derail an adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent.  [Citation.]  A child who has been adjudged a dependent of the juvenile court should not be deprived of an adoptive parent when the natural parent has maintained a relationship that may be beneficial to some degree, but that does not meet the child's need for a parent." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466.)  In analyzing whether the parent-child relationship is important and beneficial we look at:  "(1) the age of the child, (2) the portion of the child's life spent in the parent's custody, (3) the positive or negative effect

8

of interaction between the parent and the child, and (4) the child's particular needs. [Citation.] While the exact nature of the kind of parent/child relationship which must exist to trigger the application of the statutory exception to terminating parental rights is not defined in the statute, the relationship must be such that the child would suffer detriment from its termination." (*Id.* at p. 467, fn. omitted.)

Here, we do not have the exceptional case where a beneficial parent-child relationship existed at the time of the section 366.26 hearing. First, the record indicates that although Mother made efforts to visit the children, she missed and was late for many visits. Mother failed to engage in the children's daily lives and play a substantial parental role largely because she never fully addressed the basis for the dependency case and thus her visitation remained monitored and limited. Mother continued to engage in criminal behavior, maintained a romantic and abusive relationship with Father, and failed to obtain stability in her life.

"[T]he parents must do more than demonstrate 'frequent and loving contact' [citation], an emotional bond with the child, or that the parents and child find their visits pleasant. [Citation.] Rather, the parents must show that they occupy 'a parental role' in the child's life." (*In re Andrea R.* (1999) 75 Cal.App.4th 1093, 1108.) "The significant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation. [Citation.] The relationship arises from day-to-day interaction, companionship and shared experiences." (*Autumn H., supra,* 27 Cal.App.4th at p. 575.) It is particularly difficult to show that such strong and beneficial parent-child relationship exists and that termination of parental rights would be detrimental to the child when Mother has failed to advance beyond supervised visitation over the course of this three-year dependency case. (See *In re Casey D.* (1999) 70 Cal.App.4th 38, 51.)

Second, substantial evidence supports the determination that the children would not benefit from a continuing relationship with Mother. Trinity was five years old and Tatiana was three years old when the juvenile court took jurisdiction over them. Three years have elapsed and the girls have spent a substantial portion of their lives in foster care. The stress created by the lack of permanency and stability in their lives manifested in their poor behavior at and before visits with the parents. The children need permanency and stability, which the adoptive family has and can continue to provide them and which Mother has failed to secure. The adoptive parents also have successfully satisfied the children's complex educational[,] behavioral[,] and emotional needs. Furthermore, maintaining a relationship with Mother has caused the children emotional stress as they are torn between their loyalty to Mother and their new family, and worried about Mother's well-being.

To the extent that Mother asserts that the children would benefit from a continued relationship because the children expressed that they wanted to return to Mother, the juvenile court assessed these responses were at least partially coached by Mother. (See *In re Ricardo L.* (2003) 109 Cal.App.4th 552, 564 ["[I]ssues of fact and credibility are questions for the trier of fact."].) In addition, the children also expressed that if they could not be reunified with their parents, they would like to be adopted. Mother appeared incapable of adequately getting her life together to provide a stable and safe home for the children, as evidenced by her history of drug use and the incarcerations which took place throughout the dependency case. Thus, the evidence supports the court's conclusion that the children wanted to be adopted.

On appeal, Mother is essentially asking us to reweigh the evidence and to substitute her judgment regarding the applicability of this exception to termination of parental rights for the judgment of the trial court. We decline to do so. We do not review the record to determine whether there is substantial evidence to support a contrary finding by the juvenile court (i.e., the section 366.26, subdivision (c)(1)(B)(i) exception applies), but rather we review the entire record to determine whether there is substantial evidence to support the finding the court made (i.e., the section 366.26, subdivision (c)(1)(B)(i)

10

exception does not apply).  (*In re L. Y. L., supra,* 101 Cal.App.4th at p. 947; *Autumn H., supra,* 27 Cal.App.4th at p. 576.)  The burden on appeal is on Mother to show that the judgment was not supported by substantial evidence and thus demonstrate that the beneficial parent-child relationship exception does apply.  We conclude that Mother has failed to do so and that substantial evidence supports the juvenile court's determination.

Therefore, we hold that the juvenile court did not err by refusing to apply the beneficial parent-child relationship exception to termination of parental rights.

## DISPOSITION

The juvenile court's judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

JONES, J. [*]

We concur:

EDMON, P. J.

ALDRICH, J.

---

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.