Filed 9/14/21  In re J.B. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re J.B. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E076816 |
| Plaintiff and Respondent, | (Super.Ct.Nos. J279804 & J287211) |
| v. | OPINION |
| J.B., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County. Christopher B. Marshall, Judge. Affirmed.

Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant.

Michelle D. Blakemore, County Counsel and Dawn M. Martin, Deputy County Counsel for Plaintiff and Respondent.

1

Mother appeals an order terminating her parental rights and freeing her two young sons for adoption by their current caregiver, their godmother. Mother argues the court erred in failing to apply the parental benefit exception when considering which permanent plan to select for the boys. (Welf. & Inst. Code, § 366.26, subd. (c)(1)(B)(i), unlabeled statutory citations refer to this code.)

We affirm. On this record, mother cannot demonstrate that any harm the boys might suffer from the termination of her parental rights would outweigh the important permanency and stability benefits of adoption.

# I

## FACTS

The subjects of this appeal are mother's two sons, J-R (who was born in January 2017) and Carlitos (who was born during this dependency proceeding, in October 2020). The juvenile court took jurisdiction of J-R in April 2019 when he was two years old and removed him from mother's care based on safety concerns over her unaddressed mental health issues, history of substance abuse, and history of domestic violence with J-R's father, Ross.

Mother was in jail at the time of the hearing. Months earlier, she had beaten the maternal grandmother (with whom she lived), giving her a black eye and leaving bruises and bite marks on her body. Mother had also been placed on a psychiatric hold for locking herself inside her house with a homeless man she had just met, leaving J-R and his four-year-old stepsister Jessica outside, crying and unattended. The maternal

2

grandmother told a social worker from San Bernardino County Children and Family Services (the department) that mother was mentally unstable and not a safe parent. Mother herself expressed a similar sentiment when the social worker interviewed her in jail, saying she could not care for her children because she was having "weird thoughts." The maternal grandmother also reported there was domestic violence between mother and Ross, who was currently serving time in prison for robbery. She said Ross would hit mother in front of the children.

The court removed J-R and Jessica from mother's care, and over the ensuing twelve months of services, mother made progress on her case plan. She obtained a job and found stable housing, and she took steps to get a restraining order against Ross, who, after his release from prison, had attacked her as she was leaving work one evening. J-R and Jessica stayed with mother on an extended visit for over two months during the reunification period and that visit went well. The social worker observed that mother and the children "appear to have a healthy positive relationship as they interact well with each other without reservation." She also noted that J-R was affectionate and loving with both mother and Jessica. Based on these positive developments, in June 2020, the juvenile court returned J-R and Jessica to mother's care with family maintenance services and ordered her not to allow Ross in her home.

Unfortunately, mother did not remain protective when it came to Ross. In October 2020, the department learned she and Ross had just had another child (Carlitos) and that she was letting Ross live with her and was leaving the children unsupervised in his care.

3

Jessica told the social worker she was scared of Ross and that mother had left her alone with him when she went shopping. When the social worker visited mother's home, she found marijuana and drug paraphernalia on mother's counter, and she confirmed with the landlord that Ross had been living there. Mother denied knowing about the marijuana but then tested positive for the drug.

In December 2020, the juvenile court removed Jessica, J-R, and Carlitos from mother's care. The court placed Jessica with her biological father and ultimately terminated her dependency (a decision mother does not challenge in this appeal), and it placed J-R and Carlitos with J-R's godmother, Ms. B., who had known both boys since birth, was like a family member, and had already been caring for them for about a month.

In advance of the boys' permanency planning hearing, the department recommended terminating mother's parental rights and selecting adoption as their permanent plan. Mother had been consistently visiting the boys since their removal and by all accounts the visits went well. She acted appropriately and J-R was happy and comfortable in her presence. Ms. B. said that J-R loved going to the visits, "but also asks what took me so long to pick him up." Both boys were doing well in Ms. B.'s care, and J-R told the social worker he was happy living with his godmother.

The court held the permanency planning hearing on April 1, 2021. Mother argued the parental benefit exception to terminating parental rights applied and asked the court to select a less permanent plan than adoption, one that didn't require severing her relationship with her sons. The court concluded the exception did not apply. It noted that

4

the boys had spent a significant portion of their young lives outside of mother's care—in the care of a person who had known them their entire lives and was like family—and as a result, there was no evidence that any harm caused by severing the parental relationship would outweigh the stability benefits of adoption. The court terminated mother's parental rights over J-R and Carlitos and ordered adoption as their permanent plan. Mother filed a timely appeal.

## II

## ANALYSIS

Mother argues the court's conclusion that the parental benefit exception did not apply is incorrect. As we'll explain, we conclude the court's determination was reasonable.

"'The objective of the dependency scheme is to protect abused or neglected children and those at substantial risk thereof and to provide permanent, stable homes if those children cannot be returned home within a prescribed period of time.' [Citation.] When the child is removed from the home, the court first attempts, for a specified period of time, to reunify the family." (*In re Celine R.* (2003) 31 Cal.4th 45, 52.) After reunification services are denied or terminated, "'the focus shifts to the needs of the child for permanency and stability.'" (*Ibid.*) Adoption is preferred once reunification services have been terminated, and "adoption should be ordered unless exceptional circumstances exist." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 51.)

Under section 366.26, subdivision (c)(1), the juvenile court must terminate parental rights if it finds "by clear and convincing" evidence it is likely the child will be adopted. However, "when a court proceeds to select a permanent placement for a child who cannot be returned to a parent's care, the parent may avoid termination of parental rights in certain circumstances defined by statute. One of these is the parental-benefit exception." (*In re Caden C.* (2021) 11 Cal.5th 614, 617 (*Caden C.*).) This exception applies when (i) the parent has "maintained regular visitation and contact with the child and the child would benefit from continuing the relationship" and (ii) the court finds that the parent-child relationship presents a "*compelling reason* for determining that termination [of parental rights] would be detrimental to the child." (§ 366.26, subd. (c)(1)(B)(i), italics added.)

Recently, in *Caden C.*, our Supreme Court provided guidance for applying this exception. "The language of [the parental benefit] exception, along with its history and place in the larger dependency scheme, show that [it] applies in situations where a child cannot be in a parent's custody but where severing the child's relationship with the parent, even when balanced against the benefits of a new adoptive home, would be harmful for the child." (*Caden C.*, *supra*, 11 Cal.5th at p. 630.) The court indicated we should continue to be guided in our understanding of these elements by one of the foundational appellate court opinions discussing the parental benefit exception, *In re Autumn H.* (1994) 27 Cal.App.4th 567 (*Autumn H.*), which emphasized that in "assessing whether termination would be *detrimental*, the trial court must decide whether the harm

6

from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home." (*Id.* at p. 575.)

"'If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[]' the child, the court should not terminate parental rights. [Citation.] That subtle, case-specific inquiry is what the statute asks courts to perform: does the benefit of placement in a new, adoptive home outweigh 'the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship with [the parent?]' [Citation.] When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due to*' the child's beneficial relationship with a parent." (*Caden C.*, *supra*, 11 Cal.5th at pp. 633-634.)

*Caden C.* makes clear that this is the end of the analysis, and in so concluding, our Supreme Court disagreed with those appellate opinions that have required some *additional* compelling reason for the exception to apply. Under *Caden C.*, the only compelling reason required is that the parent-child relationship is *so significant* it *outweighs* the benefits of adoption. (*Caden C.*, *supra*, 11 Cal.5th at pp. 632-633, 642.)

"What this means is that the parent asserting the parental benefit exception must show, by a preponderance of the evidence, three things. The parent must show regular visitation and contact with the child, taking into account the extent of visitation permitted. Moreover, the parent must show that the child has a substantial, positive,

emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship. And the parent must show that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home. When the parent has met that burden, the parental-benefit exception applies such that it would not be in the best interest of the child to terminate parental rights, and the court should select a permanent plan other than adoption." (*Caden C.*, *supra*, 11 Cal.5th at pp. 636-637.) When determining whether the exception applies, the juvenile court should consider a number of factors, including the age of the child, the amount of time they spent in the parent's custody, the quality of interaction between parent and child, and the child's particular needs. (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.)

We review the juvenile court's finding on the frequency of contact and the existence of a beneficial relationship for substantial evidence, and we apply the abuse of discretion standard to the court's decision whether terminating parental rights would be detrimental to the child so as to outweigh the permanency benefits of adoption. (*Caden C.*, 11 Cal.5th at pp. 640-641.)

Here, it is undisputed that mother maintained consistent and positive contact with her sons. The only question we face is whether she demonstrated that she shared such a substantial, positive emotional attachment with them that the harm of severing the parent-child relationship outweighed the benefit of stability in adoption. On this point, mother rightly concedes she cannot satisfy this burden with regard to Carlitos because he was a

8

newborn when he was removed from her care. She argues she has, however, made the required showing for J-R, because the record demonstrates he was happy and comfortable in her presence during every visit, including the two-month long extended visit in the summer of 2020. She also points out she consistently displayed appropriate parenting skills during visits.

While we acknowledge the record does contain these positive facts, we must also point out that they fall short of demonstrating that mother's relationship with J-R was so positive and substantial that it outweighed the benefits of living in a permanent home with his godmother. J-R is very young. He was just two years old when he was first removed from mother, at which point he spent over a year in foster care. He was returned to mother, but their reunification did not last long. After only about seven months in mother's care, he was placed with Ms. B., who has also been able to give him a home where he feels happy and comfortable.

In short, J-R has spent a substantial portion of his young life outside mother's care, and during those extended periods he exhibited no signs the separation was causing him distress. And while he does react positively to mother, he is also happy living with Ms. B. and doing well in her home. Thus, at best, the record shows J-R enjoys being with mother and Ms. B equally—he loves visits with mother but is also excited for Ms. B. to pick him up. Unfortunately for mother, that kind of affectionate relationship with a young child is not what the parental benefit exception was enacted to protect. We do not doubt that mother loves J-R and he also loves her, but, crucially, the record contains no indication

9

that adoption will be detrimental for this child. Under these circumstances, we conclude the juvenile court acted reasonably in determining that the prospective harm in severing the parent-child relationship did not outweigh the important benefits of adoption.

## III

## DISPOSITION

We affirm the judgment.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

SLOUGH
J.

We concur:

MILLER
Acting P. J.

RAPHAEL
J.