Filed 8/10/22 In re V.V. CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re V.V. et al., Persons Coming Under the Juvenile Court Law. | B317159 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. D.V., Defendant and Appellant. | (Los Angeles County Super. Ct. No. 18CCJP03513A-B) |

APPEAL from orders of the Superior Court of Los Angeles County, Mary E. Kelly, Judge. Affirmed.

Gina Zaragoza, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Navid Nakhjavani, Principal Deputy County Counsel, for Plaintiff and Respondent.

Dan. V. (Father) challenges the juvenile court's order terminating his parental rights to his daughter V.V. and son D.V. We are asked to decide whether the juvenile court erred in declining to rely on the parental benefit exception to forgo terminating parental rights. In particular, we consider whether substantial evidence supports the juvenile court's finding that no beneficial relationship existed between Father and the children and whether the juvenile court abused its discretion when it found terminating Father's parental rights would not be detrimental to the children.

## I. BACKGROUND

### A. *Investigation and Assumption of Dependency Jurisdiction*

V.V. was born in August 2008; D.V. was born in December 2009. The events that led to the dependency orders challenged in this appeal began in May 2018.[1]

A teacher at V.V.'s school reported to the Los Angeles County Department of Children and Family Services (the Department) that V.V. disclosed an uncle had been sexually

---

[1] The children had been adjudicated dependents of the juvenile court on two previous occasions. In August 2012, the juvenile court sustained a dependency petition alleging the children were at risk based on their mother A.U.'s (Mother's) history of mental and emotional problems and drug use, plus Father's failure to protect them. In October 2014, the juvenile court sustained allegations based on both parents' alcohol abuse as well as Mother's history of mental and emotional problems and drug use. The children were released to Father in both cases, and he was granted sole physical and legal custody.

abusing her for years.[2] V.V. discussed the abuse in detail with a Department social worker. V.V. said she mentioned the abuse to D.V. about a year earlier, but D.V. could not recall what she told him. V.V. did not believe anyone else in the home was aware of the abuse, and she had not reported it to any adults because her uncle threatened to "break the house down" and she was worried she would get in trouble.

The children told a Department social worker they lived with Father, their maternal grandmother, and two uncles.[3] The grandmother cared for the children, and V.V. said she is "everything to [them]. She's [their] mom, dad, gramma and grandpa. She does everything for [them]." D.V. reported Father "drinks a little bit" and "[s]ometimes he gets drunk. He always goes to his room and locks the door. . . . He's mean sometimes. He argues with us and tries to take us somewhere . . . . He says mean stuff like [you're] dumb and ugly . . . ." V.V. said Father left the home for days at a time, explaining: "He gets drunk sometimes and goes somewhere. He does that and he likes it because he won't stop. He has red eyes and a grumpy voice. He acts a little scary."

Father, who had red eyes and smelled of alcohol at the time of an interview with a social worker, said it was "possibl[e]" V.V. had been abused by her uncle but the allegations were "difficult" to believe because he had not observed any concerning behavior and the uncle was someone he trusted. Father also suspected the

---

[2]     A school psychologist also reported V.V. said the uncle abused D.V., but D.V. denied this and V.V. told a social worker she was not aware of anyone touching D.V.

[3]     Neither child had seen Mother for at least a year.

allegations were fabricated by Mother, who had accused the uncle of molesting D.V. a couple years earlier.[4]  Nonetheless, Father acknowledged the uncle "ha[d] to leave."  When a medical examination confirmed injuries to V.V. consistent with sexual abuse, Father "began crying and said he believe[d] his daughter."  Within a couple months, however, V.V. told her grandmother that Father said he would punish V.V. the next time she "speaks up or says anything."

Father claimed he stopped drinking alcohol during the earlier dependency proceedings involving the children but relapsed a few months earlier when his mother died.  He acknowledged leaving the home for days at a time, and he said the children's grandmother took care of them.  While the Department was investigating the sexual abuse allegations, Father tested positive for cocaine.

The children's grandmother told a social worker she moved in to the family home to look after the children and she was their primary caregiver.  As she put it, she had "played the role of the children's 'mother' since they were born."  She had not witnessed any inappropriate behavior, but she did not spend time in the portion of the house occupied by Father and his brothers.

The juvenile court asserted dependency jurisdiction over the children in September 2018 based on the substantial risk of serious physical harm presented by the uncle's sexual abuse of V.V., Father's failure to protect her, and Father's alcohol and drug abuse.  Father was ordered to participate in a substance abuse program, to submit to alcohol and drug testing, and to

---

[4]      The Department's investigation of this claim in 2015 was "inconclusive."

participate in individual counseling and sex abuse counseling. He was granted three monitored, two-hour visits per week.

### B. Supplemental and Subsequent Petitions

The children were placed in foster care at the beginning of these proceedings, but they were later placed with their grandmother. Father smelled of alcohol during a visit with the children in October 2018, but he enrolled in Alcoholics Anonymous and had been "consistent and appropriate with visitation" as of March 2019. The Department exercised its discretion to permit Father unmonitored overnight visits, and these "went well." The juvenile court ordered the children placed with Father on the condition that the family continue to reside with the children's grandmother.

The following month, the Department received a report from V.V.'s school that she "said she wanted to hurt herself" because "[F]ather has been talking about seeing [the uncle who abused her] at family get togethers in the future . . . ." She told classmates she was worried about "her uncle moving back home, possibly within the next four days." V.V. was briefly hospitalized.

The children's grandmother told a social worker Father had been drinking and absent from the family home for days at a time. Father denied talking with V.V. about her uncle. He also denied—initially—he had begun drinking again and claimed he had been intermittently staying at his Alcoholics Anonymous provider site. (Residents at this facility told a social worker Father recently arrived drunk.) Within weeks, however, Father admitted to a social worker that he was drinking again and said he had not "been home lately because [he did not] want [his] children to see [him] like this."

5

Father agreed to leave the home within a few days and signed an affidavit stating he needed the children's grandmother to care for them while he sought mental health treatment. When asked about his role in the family home, Father said he would "come and see if everything is fine" but the children's grandmother took care of the children, cooked for them, and took them to school. The children's grandmother reported D.V. missed a recent mental health appointment because Father was away from home. V.V. said she only saw Father a few days each week and he would "sleep and sleep."

In May 2019 (less than two months after the children were returned to Father's care), the Department filed supplemental and subsequent dependency petitions. The children were removed from Father's custody and placed with their grandmother, who monitored one two-hour visit with Father each week. The Department exercised its discretion to grant Father unmonitored daytime visits in September 2019, and these were "going well."

In October 2019, the juvenile court sustained an allegation in the supplemental petition that Father failed to participate in court-ordered services and failed to ensure the children participated in wraparound services. The juvenile court also sustained an allegation in the subsequent petition that the children were at serious risk of physical harm because Father did not ensure V.V. received mental health services and left the children with their grandmother without making an appropriate plan for their care and supervision (including providing documentation needed to obtain medical treatment). Father was again ordered to participate in a substance abuse program, to

submit to testing, and to participate in individual counseling. He was granted three unmonitored three-hour visits per week.

### C. Second Supplemental Dependency Petition

Around the time the juvenile court ruled on the Department's supplemental and subsequent petitions, the Department exercised its discretion to grant Father overnight weekend visits. Although Father missed some of these visits while in an inpatient program, they were generally "going well" as of February 2020. The juvenile court once again returned the children to Father's care that month.

A few months later, however, the children's grandmother told a social worker Father was drinking again. He was also "in and out of the home"—sometimes promising to bring the children food and not following through and other times coming home late after the children were in bed.

V.V. told a social worker she had seen Father drunk outside through her window. She also mentioned that when Father drank, he sometimes summoned D.V. to his room to discuss "adult stuff." D.V. made it "very clear" to the social worker that he did not enjoy these conversations. He asked V.V. to accompany him because he did not want to be alone with Father when Father had been drinking. D.V. said Father "talks to [him] about when he dies and says that [D.V.] will be the boss of the house." Father told the children he was being deported and planned to move to Nicaragua with a new wife, but he subsequently recanted these statements. V.V. said she felt safe at home when Father was sober, but not when he was drinking. D.V. said he did not feel safe "recently" with Father in the home.

7

When interviewed by the Department, Father denied he had begun abusing alcohol again and he said he was anxious because his group programs had been canceled due to the COVID-19 public health emergency. When a social worker told Father he had recently tested positive for cocaine, Father said he would move out of the family home so the children could remain there with their grandmother. Father had a phone visit with D.V. shortly after he moved out, but V.V. declined to speak with him because he missed her virtual graduation earlier that day.

The Department filed yet another supplemental petition alleging the previous disposition was not effective in protecting the children because Father tested positive for cocaine and was under the influence of alcohol on multiple occasions while the children were under his care. The juvenile court sustained this allegation in July 2020 and again removed the children from Father's custody. The court also terminated family reunification services, but Father was allowed to continue monitored visitation with the children.

### D.    Events After Termination of Family Reunification Services

The children's grandmother expressed interest in adopting them, but, as of November 2020, the Department was still reviewing her eligibility as a permanent placement because she was going through a divorce and expected to move to a different home. The divorce was finalized in April 2021 and the Department found "no impediments to the placement or adoption" at that time.

The Department reported the children have a "wonderful bond" with their grandmother and called her "mami." V.V.

favored adoption, stating, "I do not want [Father] to take care of us because of how he treated us in the past. He would get drunk. I want to be adopted by my grandma because she knows us better than [Father]. I worry that he will begin to start drinking again." V.V. reiterated in another conversation that she "worr[ied] about the case closing and [Father] going back to how he was." She "[did] not trust" Father because of his drinking, because he "lie[d]" about being deported, and based on instances in which he promised outings and gifts without following through. V.V. knew Father "was trying," but she felt their "connection [was] not there." D.V. said he wanted Father to visit or "be home," but he wanted his grandmother to adopt him and V.V. because she "knows us well and knows how to take good care of us." D.V. was also "worr[ied] about [Father] drinking again."

Between July 2020 and August 2021, Father generally attended two of his three authorized weekly visits with the children.[5] At times during this period, Father also brought the children lunch one day per week. (When in-person learning resumed, Father also drove the children to school.) The children told a social worker their visits with Father were short, "lasting 30 minutes to an hour," and he "sometimes only drop[ped] off food for the children, greet[ed] them and le[ft]." At other times, Father would greet the children, "inquire[ ] about school, bring[ ] them food and sometimes watch[ ] TV with them," but there was "no other form of bonding." The children said they enjoyed the visits, but V.V. asked Father to "stay a little longer" and D.V.

---

[5] Father missed at least a couple visits each month between January and August 2021.

9

wanted Father to "talk with [him and V.V.] more." Both children said Father did not play with them.

In January 2021, Father filed a changed circumstances petition seeking reinstatement of family reunification services. He argued, among other things, that he was sober and had recently completed an outpatient substance abuse program. The Department recommended the juvenile court deny the petition.

The juvenile court held a hearing in June 2021 to consider Father's changed circumstances petition and to address whether the parental benefit exception to law that would otherwise require termination of Father's parental rights might apply.

Both the Department and the children's attorney asked the juvenile court to deny the changed circumstances petition based on Father's long history of substance abuse, his pattern of recovery only to be followed by relapse, and the children's desire for their grandmother to adopt them. Father's attorney argued he was currently sober, testing, and continuing to participate in treatment; he had completed sexual abuse awareness and other parenting classes; and he had enhanced his bond with the children, who, he asserted (in contrast to the position taken by their attorney), supported the changed circumstance petition.

The juvenile court found that circumstances were changing—but not changed—and that reinstating family reunification services was not in the children's best interest. Among other things, the juvenile court emphasized Father's inappropriate statements to the children, the anxiety those statements produced, and the children's concern that Father might once again relapse. With respect to the parental benefit exception, the juvenile court continued the hearing on that issue because it believed a bonding study would be helpful. The court

stated legal guardianship was an available option and remarked the children appeared to be "still . . . very attached" to Father.

### E. The Bonding Study and the Juvenile Court's Termination of Parental Rights

The bonding study was prepared by Dr. Nancy Kaser-Boyd, who met with Father, V.V., and D.V. in October 2021.

V.V. told Dr. Kaser-Boyd she did not want to return to Father's care because he had done things that "affected [her] in a bad way." Specifically, she was concerned that Father invited "[u]nsafe people" to their home. V.V. did not want to have overnight visits or go on any trips with Father, but she was "open to" continued visits with Father at her grandmother's home. Dr. Kaser-Boyd noted V.V. has "lingering anxiety" and appeared to be "still working through the issues of molestation." She is "quite needy" and "too fragile to be thrown into anxiety-provoking situations."

D.V. told Dr. Kaser-Boyd he was concerned that Father might resume drinking when social workers were no longer present. D.V.'s principal concern with respect to Father's drinking was that Father would have long, uncomfortable conversations with him. D.V. wanted to remain with his grandmother and, when asked whether he was interested in overnight visits or trips with Father, appeared anxious and said no. Nonetheless, D.V. was "very definite" that he wanted Father to continue to visit.

Dr. Kaser-Boyd observed Father "appears to have a commitment to the children" and believed the fact that he "maintain[ed] a cooperative relationship with the children's [maternal grandmother] . . . demonstrates a good character . . . ."

11

She opined, with respect to both children, that "they are attached to [Father], but have experienced him at his times of weakness and are lacking in security about whether his rehab is a stable condition."

The juvenile court held a further hearing to consider the bonding study and the applicability of the parental benefit exception in December 2021.[6]

Father's attorney argued he maintained regular contact with the children, emphasized Dr. Kaser-Boyd's view that the children were bonded with Father, and pointed out that Father provided financially for the children. Counsel for the children and the Department's attorney asked the juvenile court to terminate Father's parental rights. The children's attorney argued that Father visited the children frequently but the visits were so "brief" and "lacking in quality" that they did not "result[ ] in the cultivation . . . or preservation of a bond so beneficial to the children that its benefits, in conjunction with his history of relapse and removal, outweigh the benefits of permanency in the safe and stable home that the grandmother has been providing." The children's attorney further stated that V.V. asked them to inform the court that she did not "have an active bond" with Father and also highlighted a prior statement by D.V. that he wanted his grandmother to adopt him. The Department argued "inconsistent visits and short visits" by Father, "as well as his pattern of really just failing to live up to his promises,"

---

[6]     Shortly before the hearing, in November 2021, V.V. was twice hospitalized based on concerns about her mental health. The appellate record does not include a detailed discussion of these episodes.

12

demonstrated the lack of a parental bond.  Additionally, in the Department's view, the stability offered by the children's grandmother demonstrated that terminating Father's parental rights would not harm the children.

The juvenile court found the first element of a parental benefit exception showing—regular visitation and contact—was satisfied.  As to the second element—whether the children would benefit from continuing the relationship—the juvenile court was concerned the children did not "have the trust in Father that he will continue to go forward as he has not been able to gain their trust and keep their trust."  The juvenile court believed the children were mature enough "to assess how they feel about their relationship" and emphasized that, "[f]rom [their] statements, it appears very obvious . . . that it is the maternal grandmother who has provided that psychological importance and that important relationship to them."  With respect to the third element—whether terminating the relationship would be detrimental to the children—the juvenile court noted the grandmother would probably continue to allow the children to visit Father,[7] but concluded, even assuming the contrary, "life would be much better for these children in the adoptive home because they are secure" and "[t]hey are safe."  The juvenile court accordingly could not "find that the loss of the relationship [with Father] outweigh[ed] the benefit of the new adoptive home" and terminated Father's (and Mother's) parental rights.

Father appeals the parental rights termination order.

---

[7]     A status review report prepared a couple weeks after the juvenile court terminated Father's parental rights confirmed that Father continued to visit the children and drive them to school.

## II.  DISCUSSION

The juvenile court determined the parental benefit exception did not apply for two independent reasons: Father did not prove the requisite beneficial relationship and did not show terminating his parental rights would be detrimental to the children.  Father's challenge to the first of these findings focuses on statements by the children indicating they missed Father and wanted him to visit more.  That, however, fails to account for evidence that the children no longer trusted Father.  Moving to the second of these findings, the juvenile court did not abuse its discretion in concluding that terminating the relationship would not be detrimental where the children's grandmother had looked after them since before these proceedings began, shared a "wonderful" bond with them, and was the adoptive parent the children wanted.

### A.  *The Parental Benefit Exception*

When a parent is unable to remedy the issues giving rise to dependency jurisdiction, the juvenile court holds a hearing under Welfare and Institutions Code section 366.26 to determine "whether to terminate parental rights, making way for adoption, or to maintain parental rights and select another permanent plan."[8]  (*In re Caden C.* (2021) 11 Cal.5th 614, 625 (*Caden C.*).)  "To ease the court's difficult task in making this important decision, the statute provides a carefully calibrated process.  Even if a court finds by clear and convincing evidence that the child is likely to be adopted, the parent may avoid termination of

---

[8]    Undesignated statutory references that follow are to the Welfare and Institutions Code.

14

parental rights by establishing at least one of a series of enumerated exceptions." (*Ibid.*)

One of these exceptions, set forth at section 366.26, subdivision (c)(1)(B)(i), is the parental benefit exception. The exception is "limited in scope" and applies where "'[t]he court finds a compelling reason for determining that termination would be detrimental to the child due to one or more of the following circumstances: [¶] (i) The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship.' (§ 366.26, subd. (c)(1)(B)(i).) From th[is] statute, [our Supreme Court] readily discern[ed] three elements the parent must prove to establish the exception: (1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Caden C.*, *supra*, 11 Cal.5th at 631, third, fourth, and fifth alterations added.) Because we conclude the juvenile court correctly determined the second and third elements were not satisfied, we do not consider the Department's contention— contrary to the juvenile court's finding—that Father also failed to establish the first element.

The second element—whether the child would benefit from continuing the relationship—depends on "a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.'" (*Caden C.*, *supra*, 11 Cal5th at 632, citing *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576 (*Autumn H.*).) As emphasized in *Autumn H.*, which *Caden C.* cited as "the seminal decision interpreting the exception" (*Caden C.*, *supra*, at 631), the

parental benefit exception is not concerned with the "incidental benefit" that "[i]nteraction between natural parent and child will always confer." (*Autumn H.*, *supra*, at 575-576 [holding that a relationship comparable to that of a "'friendly visitor'" or "'family friend'" is insufficient to trigger the exception].) Nonetheless, juvenile courts "must remain mindful that rarely do '[p]arent-child relationships' conform to an entirely consistent pattern. [Citations.]" (*Caden C.*, *supra*, at 632, second alteration added.)

The third element—whether terminating the relationship would be detrimental to the child—requires the juvenile court to determine "whether the harm of severing the relationship outweighs 'the security and the sense of belonging a new family would confer.' [Citation.] 'If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[ ]' the child, the court should not terminate parental rights. [Citation.]" (*Caden C.*, *supra*, 11 Cal.5th at 633, citing *Autumn H.*, *supra*, 27 Cal.App.4th at 575.) Relevant factual determinations include "the specific features of the child's relationship with the parent and the harm that would come from losing those specific features," "how harmful in total that loss would be," and "for the particular child, how a prospective adoptive placement may offset and even counterbalance those harms." (*Caden C.*, *supra*, at 640.)

A reviewing court uses the substantial evidence standard to evaluate a juvenile court's determination of the existence vel non of a beneficial relationship. (*Caden C.*, *supra*, 11 Cal.5th at 639.) "[T]he ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship

16

with his parent—is discretionary and properly reviewed for abuse of discretion."  (*Id.* at 640.)

### B.    *Analysis*
#### 1.    *Beneficial relationship*

Our Supreme Court has made clear that the issues leading to dependency are of limited relevance in determining whether the parental benefit exception applies.  (*Caden C.*, *supra*, 11 Cal.5th at 638 ["The parent's continuing difficulty with mental health or substance abuse may not be used as a basis for determining the fate of the parental relationship by assigning blame, making moral judgments about the fitness of the parent, or rewarding or punishing a parent"].)  Nonetheless, "[a] parent's struggles may mean that interaction between parent and child at least sometimes has a '"negative" effect' on the child," and "are relevant to that extent."  (*Id.* at 637-638)

There is no question in this case that Father's recurring substance abuse issues tainted his relationship with the children.  He left the house for days at a time without notice, he was unable to follow through on promises to the children, he forced them into conversations that made them uncomfortable, and he made comments—e.g., about his plans to leave the country—that undermined their sense of stability.  As Dr. Kaser-Boyd put it in the bonding study, the children "have experienced [Father] at his times of weakness and are lacking in security about whether his rehab is a stable condition."  As a result, neither V.V. nor D.V. trusted Father or wanted to have extended visits with him.

Moreover, even when Father was sober, there is little evidence that he was able to develop a beneficial relationship with the children.  He drove the children to school and dropped

17

off meals, but visits were short, both children said he did not play with them, and D.V. remarked that Father should talk with them more. Father also demonstrated insensitivity to V.V.'s "'particular needs'"—indeed, he provoked her to threaten self-harm—by suggesting she would have to see her abuser again. (*Caden C.*, *supra*, 11 Cal.5th at 632.) Under these circumstances, substantial evidence supports the finding that the children would not benefit from continuing their relationship with Father. (*Ibid.* ["[C]ourts often consider how children feel about, interact with, look to, or talk about their parents" when assessing whether a child would benefit from continuing the relationship]; *In re B.D.* (2021) 66 Cal.App.5th 1218, 1230 ["A positive attachment between parent and child is necessarily one that is not detrimental to the child but is nurturing and provides the child with a sense of security and stability"].)

In arguing the contrary, Father primarily relies on the children's statements that they missed him and enjoyed their visits. He cites no evidence, however, indicating these statements reflect anything more than the "incidental benefit" that "[i]nteraction between natural parent and child will always confer." (*Autumn H.*, *supra*, 27 Cal.App.4th at 575.) Father also argues the children lived with him most of their lives, but this carries little weight in proving the existence of a beneficial relationship given the circumstances in which they lived together: Father was absent for extended periods—whether going to his room and locking the door or leaving the home altogether—and it was generally acknowledged that Father delegated the physical and emotional care of the children to their grandmother. As V.V. put it, their grandmother did "everything" for them and assumed the roles of "mom, dad, gramma and grandpa."

## 2. *Detriment*

The juvenile court did not abuse its discretion in determining that any harm that may result from terminating Father's parental rights would be outweighed by the security and stability they found living with their grandmother. The children's grandmother had been "everything" to them (since even before this dependency proceeding began) and they called her "mami." (*In re A.L.* (2022) 73 Cal.App.5th 1131, 1157 ["[I]t was proper for the juvenile court to consider whether, and the extent to which, the caregivers and [the] father occupied parental roles with the minor"].) Both children wanted the grandmother to adopt them. She was a constant presence when Father relapsed and left the home for extended periods of time. Father's periodic reappearances—during which, among other things, he broached the prospect of further contact with V.V.'s abuser and engaged D.V. in inappropriate conversation—destabilized the children's lives with their grandmother.

Father contends the juvenile court could not properly conclude the children would not be harmed by the termination of his parental rights without concrete evidence of the children's feelings concerning the possibility that they would never see him again. While Father is correct that "courts must assume that terminating parental rights terminates the relationship" (*Caden C.*, *supra*, 11 Cal.5th at 633), there is no reason why the juvenile court could not infer the impact on the children from other evidence, including his sporadic disappearances.

Father's further contention that terminating his parental rights is bound to be detrimental to the children because D.V. missed Mother (who had already been out of the children's lives for a significant period) also misses the mark. Father's burden

19

was not merely to establish that terminating his parental rights may have negative consequences, but that these consequences outweigh the benefits of adoption. (*Caden C.*, *supra*, 11 Cal.5th at 640.) With only weak evidence that detriment would flow from severing any bond between Father and the children (including the children's own stated preference for adoption) and strong evidence that the children's grandmother was providing the safety and security they would otherwise lack, the juvenile court was within its discretion in deciding that terminating Father's parental rights would not be detrimental.

## DISPOSITION

The juvenile court's orders are affirmed.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

BAKER, J.

We concur:

RUBIN, P. J.

MOOR, J.