Filed 12/30/24  In re C.K. CA1/5

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| In re C.K., A Person Coming Under the Juvenile Court Law. | |
| SONOMA COUNTY HUMAN SERVICES DEPARTMENT,<br>        Plaintiff and Respondent,<br>v.<br><br>SARAH C.,<br>        Defendant and Appellant. | A170926<br><br>(Sonoma County Super Ct. No. DEP6745) |

Sarah C. (Mother) appeals from the juvenile court's order terminating her parental rights (Welf. & Inst. Code, § 366.26) to her then one-year-old daughter.[1]  She contends the court erred in finding the beneficial parental relationship exception (§ 366.26, subd. (c)(1)(B)(i)) did not apply.  We disagree and affirm.

### BACKGROUND

### A.

After a parent's reunification services are terminated, the focus of dependency proceedings "changes from family reunification to the child's interest in permanence and stability." (*In re G.B.* (2014) 227 Cal.App.4th 1147, 1163.)  Children have

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

1

"compelling rights . . . to have a placement that is stable, permanent, and that allows the caretaker to make a full emotional commitment to the child." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 306.) At a section 366.26 hearing, the court is statutorily authorized to order one of three alternatives: adoption, guardianship, or long-term foster care. (*In re S.B.* (2008) 164 Cal.App.4th 289, 296; accord, § 366.26, subd. (b).) Adoption is the preferred permanent plan. (*In re Caden C.* (2021) 11 Cal.5th 614, 630-631 (*Caden C.*); *In re Autumn H.* (1994) 27 Cal.App.4th 567, 573; accord, § 366.26, subds. (b), (c)(1).)

Thus, "the court must first determine by clear and convincing evidence whether the child is likely to be adopted. (See § 366.26, subd. (c)(1).) If so, and if the court finds that there has been a previous determination that reunification services be terminated, then the court shall terminate parental rights to allow for adoption. [Citation.] But if the parent shows that termination would be detrimental to the child for at least one specifically enumerated reason, the court should decline to terminate parental rights and select another permanent plan. (See § 366.26, subd. (c)(1)(B)(i)–(vi), (4)(A).) As we have previously explained, '[t]he statutory exceptions merely permit the court, *in exceptional circumstances* [citation], to choose an option other than the norm, which remains adoption.' " (*Caden C., supra,* 11 Cal.5th at pp. 630-631, italics added.)

The beneficial relationship provision is one such exception. (§ 366.26, subd. (c)(1)(B)(i); *Caden C., supra,* 11 Cal.5th at p. 629.) "What it requires a parent to establish, by a preponderance of the evidence, is that the parent has regularly visited with the child, that the child would benefit from continuing the relationship, and that terminating the relationship would be detrimental to the child. (See Welf. & Inst. Code, § 366.26, subd. (c)(1)(B)(i); Evid. Code, § 115.) The . . . exception applies in situations where a child cannot be in a parent's custody but

2

where severing the child's relationship with the parent, even when balanced against the benefits of a new adoptive home, would be harmful for the child." (*Caden C.,* at pp. 629-630.)

**B.**

The Sonoma County Human Services Department (Department) initiated these proceedings in early December 2022, after Peter K. (Father) was stopped while driving under the influence of methamphetamine with Mother, then pregnant with C.K.; 10-year-old S.C.; possibly seven-year-old K.C.; and older half-sister J.P. in the car. Father was arrested for driving under the influence, possession of methamphetamine and paraphernalia, driving on a suspended license, and child endangerment.[2]

The Department filed a petition alleging Mother failed to protect S.C. and K.C. from Father, and that his daily methamphetamine use and possession of drugs and paraphernalia placed the children at significant risk of harm. Mother also had a long history of substance abuse, had used methamphetamine, alcohol, and other substances during previous pregnancies, and had shown no capacity over the past 10 years to protect her children. Between 2017 and 2021, her parental rights to her four other children with Father had been terminated due to substance abuse and related issues, while older daughter J.P. had been placed in a legal guardianship after numerous Department interventions for severe neglect and parental substance abuse.

Mother gave birth to C.K. at a birthing center less than two weeks after Father's arrest. The same day that Mother and C.K. were discharged, C.K. was transported to the NICU for

---

[2] Father has not challenged the trial court's order terminating his parental rights, so we limit references to him to those relevant to Mother's appeal.

dehydration and placed in emergency foster care following treatment. The Department filed dependency petitions concerning C.K., S.C., and K.C. alleging failure to protect (§ 300, subd. (b)), risk of harm or illness in the parents' care (*ibid*.), and sibling abuse (§ 300, subd. (j)).

The Department recommended that C.K. be detained, citing Mother's long history of substance abuse and significant welfare history; her loss of custody of four other children; and the fact she had been bypassed for reunification services for three of them and, despite receiving services, failed to reunify with the fourth. S.C. had also reported Mother's trailer was unsafe to live in and that the family lacked access to water, food, and a toilet.

Mother said she had been sober for three and one-half years, but the family's child welfare history did not support her claim. She also claimed she was unaware Father was using methamphetamine. While she said she would end their relationship, if necessary, she had not done so during their previous dependency cases. The juvenile court ordered all three children detained and scheduled a jurisdiction hearing.

## C.

According to the Department's jurisdiction report, Mother continued to deny knowing Father had been using methamphetamine but said he had moved out of the family home and that she would not allow him back if he continued abusing substances. The case worker was skeptical, noting that, in January and July of 2022, police had found methamphetamine and paraphernalia in the couple's car and hotel room.

The jurisdiction report described a 20-year child welfare history involving severe neglect, drug and alcohol abuse, Mother's drug use while pregnant, exceedingly filthy and unsanitary home conditions, and sexual abuse by the paternal grandfather of an adult child (R.B.) from Mother's previous relationship. It also

4

recounted the parents' substance abuse-related criminal charges and convictions from 2000 to 2020. Father's parents told the case worker that Mother had used and exposed the children to drugs including marijuana, methamphetamine, and alcohol for many years. According to the paternal grandmother, Mother and Father were " 'never going to change.' "

The juvenile court found the allegations were true and sustained the petitions. The Department's report for the disposition hearing stated that Mother and Father had recently separated. Mother verbally acknowledged she had to prioritize the children's safety and would do whatever it took to demonstrate her sobriety.

The case worker reported the children were not safe in their parents' care. Citing the parents' lengthy relationship and Father's long history of substance abuse, the worker opined Mother knew or should have known she was endangering the children by allowing him to drive them while under the influence and exposing them to methamphetamine and paraphernalia. Nonetheless, she agreed with Mother's longtime parent mentor that Mother had progressed and was " 'not the same mother she has worked with in years past.' " In view of her sobriety from methamphetamine throughout her most recent pregnancy, and her motivation, desire, and willingness to change, the Department recommended that Mother be offered reunification services "even though she has her history working against her."

Following that recommendation, the court maintained all three of the children out of the parents' custody with visitation and family reunification services for Mother. Services included individual therapy, parenting classes, a 12-step program, random drug testing, and a substance abuse assessment.

## D.

In advance of the six-month review hearing, the Department recommended continuing Mother's reunification services. Mother had been fired from her part-time job at a substance abuse treatment center but had found full-time work helping developmentally delayed adults.

Mother's safety goal was to ensure the children were not exposed to, left with, or driven by anyone who was under the influence of substances. She insisted she had been sober since July 2019 despite a positive test for substances while she was pregnant in 2021, in keeping with a long history of minimizing her historic and current substance abuse. However, she had tested clean for almost 18 months except for two tests after the most recent removal, in June 2023, that showed high levels of alcohol.

Mother had completed several parenting education classes and completed a substance abuse assessment, which did not recommend outpatient services because Mother reported she had been sober for "some time." Mother's visits with the children were consistent and generally went well, but the two older children spent most of the time on their phones. Moreover, the case worker expressed concern that Mother had inappropriately told S.C. the case worker was forcing her to break up with Father, and that this made her sad. Nonetheless, the worker was hopeful that with therapy, parenting education, and drug treatment support, Mother could make the changes necessary to provide a safe home.

At the six-month review hearing, the court authorized a trial home visit despite concerns about Mother's alcohol use. It also continued reunification services and set a three-month update hearing and a 12-month status review.

## E.

The Department's report for the three-month update again recommended continuing reunification services. K.C. and S.C. reported that Mother promised them they would soon come home and said the Department was only involved because the paternal grandmother had called the police. To prevent similar conversations, the social worker reinstated fully supervised visits.

Mother tested positive for alcohol again on August 7, 2023—her fourth positive test during the proceedings. The case worker met with her and an employee from the Drug Free Babies program. It was recommended that Mother participate in Drug Free Babies considering her continuing struggles with alcohol and extensive history of abusing substances and minimizing her use. Mother began the program and tested regularly at first, with negative results. However, by late September Mother had been avoidant, failed to engage in meetings for several weeks, and had not joined self-help groups as requested. Despite the positive test she continued to deny she was drinking, other than having had one glass of wine with a girlfriend, but "this admittance does not account for the levels of alcohol that [Mother] tested for, and [Mother] denie[d] having any alcohol since the last court hearing."

Various sources had reported multiple people were living in Mother's home, including Father, an ex-boyfriend's adult son, and R.B. with her partner and two children. There were also reports of Father hiding in a backyard shed.

During an unannounced visit, the case worker observed a pickup truck matching the description of Father's parked in the driveway and his motorcycle behind the house near the shed. Mother delayed for a minute and texted someone before allowing the worker into the home. There were men's clothes and shoes in Mother's closet and on her floor. Mother seemed nervous when

confronted with the reports of Father staying at the house and volunteered that he was there, but only to pack up some belongings. Father was nowhere in sight; Mother said he must have left, but the case worker observed an extension cord running into the backyard shed. The shed doors would not open even though the exterior locks were unlocked. The social worker also observed multiple open cans of an alcoholic drink in the living room/kitchen area. In the case worker's assessment, Mother "appear[ed] to be dishonest about what is happening in her home even when confronted with other information."

By the time of the 12-month review, the Department recommended terminating Mother's reunification services and setting a section 366.26 hearing. Its 12-month status report described an incident in Mother's home in July during which R.B.'s boyfriend verbally and physically abused her. According to R.B., this was not the first such incident. The boyfriend was arrested. Despite the case worker's warnings, Mother continued to insist it was fine for there to be alcohol in her home.

Various individuals, including S.C., reported information suggesting Mother and Father were still in a relationship and possibly living together despite Mother's case plan objective of not having contact with him. In S.C.'s view, Mother would never leave him. Mother also did not engage with the children's caregivers during transitions at visits or ask the caseworker for information about the children, appearing uninterested in their needs and more interested in being their friend than parenting them.

Mother was testing regularly but had not provided documentation of her attendance at self-help meetings. She was perceived to be "just 'going through the motions,'" rather than fully engaging in the Drug Free Babies program or taking accountability for her actions. However, Mother had maintained her sobriety and employment throughout the reporting period,

consistently attended and engaged in her individual therapy, and took multiple parenting classes.

Mother's visits with her children were reported as "very marginal." At the start of the reporting period, she had weekly individual visits with each child because she was struggling to attend to all their needs and the caseworker and service providers felt one-on-one time would help strengthen their connection. In addition, she had one weekly group visit with all three children. The visitation supervisor modeled appropriate behavior for Mother by demonstrating how to simultaneously engage with the older children while caring for C.K. Nonetheless, Mother tended to sit by while the older children played rather than engage with them, failed to reciprocate or initiate affectionate behavior, and sometimes asked to end visits early for arbitrary reasons.

The Department concluded Mother was unable to provide a safe and supportive home for the children "[d]ue to the ongoing presence of alcohol in the home, the continued minimization of responsibility of maintaining a clean and sober household, continued contact with [Father], and continued lack of connection with her children." After 12 months of services, Mother was "largely in the same spot in which she was when the current dependency matter came to be. She is still minimizing her history, appears to be hiding her relationship with [Father], and is trying to befriend her children instead of parenting and acting proactively."

In a supplemental report submitted shortly before the 12-month review hearing, the Department disclosed that Mother had tested positive for a "high level" of alcohol on December 26. While Mother told the caseworker she had just two drinks on Christmas Eve and Christmas, the level of alcohol in her system made this highly unlikely. In addition, R.B. had not followed through on getting a restraining order after the domestic violence

9

incident and apparently still lived with her partner in Mother's home.

After a contested 12-month review hearing, the juvenile court followed the Department's recommendation and terminated Mother's reunification services, found the children could not be safely returned home, and set a section 366.26 hearing. In *In re S.C.* (April 25, 2024, A169636) [nonpub. opn.], this court denied (on the merits) Mother's petition for writ relief from the order terminating reunification services and setting a section 366.26 hearing.

**F.**

The Department's section 366.26 report recommended termination of parental rights and adoption as C.K.'s permanent plan. C.K. continued to do well in her foster home, where she had been placed, with her brother K.K., since the day she was born. C.K.'s foster parents wanted to adopt her, as they had previously done for K.K. C.K. presented as a happy baby, who is closely bonded to her foster parents and K.K. Although C.K. was sometimes apprehensive with new people, she became more comfortable when supported by her foster parents, with whom she was "playful and responsive." She looked excited when her foster parents entered a room and sought them out for comfort and care. The Department reported that C.K.'s foster parents had an "extensive and reportedly positive relationship with [Mother] and [Father], due to caring for [K.K.] since July 31, 2021."

Mother was engaged in supervised visits with C.K. throughout the case. Visits were originally twice a week—one visit along with her half siblings (S.C. and K.C.) and then a second weekly one-on-one with just C.K. After reunification services were terminated, visits decreased to twice per month. The social worker indicated Mother brought snacks for the three children, changed C.K.'s diapers, and interacted appropriately

10

with C.K. C.K.'s foster parents reported that she was able to transition to her visits with Mother, but was clingier and dysregulated after such visits.

The social worker believed that C.K. obtained little benefit from continuing the relationship with Mother—as C.K. did not appear to have a significant emotional attachment to Mother and had been raised outside of Mother's care since birth. The Department also opined that termination of parental rights would not be detrimental to C.K.; although C.K.'s interaction with Mother could have some incidental benefit, the potential detriment from severing that relationship did not outweigh the benefit to be gained through the permanence of adoption. The social worker explained that C.K. was "a young vulnerable child in need of security and stability for her optimal development." Mother was not able to demonstrate she could maintain her sobriety and provide a sober, safe, and stable home and the resource parents had provided daily care, routine, and stability since C.K. was born.

At the contested hearing,[3] the court admitted the Department's report and portions of the Department's "delivered service logs" that included visitation notes.

The social worker testified that she had not personally observed Mother's visits with C.K. because they happened on Saturdays, when the social worker does not work. As is customary, she relied on observations from the visitation supervisors, as well as information that C.K.'s caregivers provided. The social worker confirmed that visits between C.K. and Mother were generally positive and that there were two visits (in January 2024) when C.K. had a hard time transitioning

---

[3] The section 366.26 hearing for S.C. and K.C. was continued and Mother's parental rights with respect to them are not at issue on this appeal.

away from Mother to the foster parent, but then was fine after a couple of minutes. However, the caregivers described C.K. "as sometimes being dysregulated, very clingy, having a hard time after visits with Mom."

In assessing the nature of C.K.'s relationship with Mother, the social worker considered various factors, including "[C.K.'s] age; her overall interactions with . . . Mother; amount of time that she spent [in M]other's care; the amount of time she spent in her current caregiver's home; the interactions she's been having with her current caregiver; and her other full sibling that currently resides in that same household. . . . History of the case as well was taken into consideration." Considering these factors, the social worker believed it would not be detrimental to C.K. to terminate parental rights. She said, "[S]ubstantially the care for [C.K.] has been in her current caregivers throughout her life where she . . . built a strong bond with them." C.K. also shares a "very strong bond" with her brother, K.K." In the social worker's view, the benefits to C.K. of having a permanent home would outweigh the harm of termination of parental rights.

Mother testified generally about her regular, supervised visits with C.K. At the beginning of the case (when C.K. was younger), Mother would read to C.K., feed her, snuggle her, and walk her around. As C.K. grew, they played with toys, continued reading, and went to the playground. C.K. calls her "Momma," looks for help from Mother, gives her hugs and kisses, and "reach[es] for [Mother] if she's in the car seat." Mother clarified that C.K. was in her custody on the day she was born; this was the only time C.K. was exclusively in her care.

C.K.'s counsel joined in the Department's recommendation to terminate parental rights. Mother's and Father's counsel did not contest C.K.'s adoptability but argued the beneficial relationship exception applied. The juvenile court found it likely that C.K. would be adopted, found that Mother had not met her

burden to show the beneficial relationship exception applies, and terminated Mother's and Father's parental rights.

## DISCUSSION

### A.

Mother argues the order terminating parental rights must be reversed because the juvenile court erred in concluding the beneficial relationship exception does not apply.  We disagree.

### 1.

To establish that the beneficial relationship exception applies, the parent bears the burden of proving the following elements: "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Caden C., supra*, 11 Cal.5th at pp. 631, 636.)  On appeal, we apply the substantial evidence standard of review to the first two elements, which are "essentially . . . factual determination[s]." (*Id.* at pp. 639-640.)  However, we review "the ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his parent"—for abuse of discretion. (*Id.* at p. 640.)

Because Mother argues that the court erred in concluding she had not met her burden of proof, the more precise question is "whether the evidence compels a finding in favor of the [parent] as a matter of law." (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, disapproved on other grounds by *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010 & fn. 7; see *In re Aurora P.* (2015) 241 Cal.App.4th 1142, 1153.)  We ask, "whether the [parent's] evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " (*In re I.W.,* at p. 1528.)

13

**2.**

The juvenile court found that Mother had established the first element—that she had regular and consistent visits with C.K.  This finding is unchallenged by the parties.

Mother insists that the juvenile court was compelled to find C.K. had a substantial emotional attachment to her.  We disagree.  Substantial evidence supports the court's finding on the second prong—that C.K.'s relationship with Mother was not a parent-child relationship but was "more akin to a friendly visitor."  In other words, Mother failed to meet her burden to show C.K. had a substantial emotional attachment to her.

As to the second element, the juvenile court is required to examine the record to ascertain whether the parent has proven by a preponderance of the evidence that "the child has a *substantial*, positive, *emotional* attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship." (*Caden C., supra*, 11 Cal.5th at p. 636, italics added.)  "[T]he focus is the child.  And the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' [Citation.] . . . [C]ourts often consider how children feel about, interact with, look to, or talk about their parents." (*Id.* at p. 632.)

Mother focuses on only one of the above factors—the "positive" effect of interaction between her and C.K.  She says that visitation logs provided to the court, along with her own testimony and the social worker's report, show that her visitation with C.K. was positive.  The logs show that, during supervised visits, Mother responded to C.K.'s cues, met her needs (changing diapers, feeding her) during visits, and read and played with C.K.  Mother further observes that the delivered service logs and visitation reports back up her testimony that, as C.K. got older,

14

she was sometimes affectionate with Mother, sometimes called her "Momma," and on two occasions had difficulty separating from her at the end of visits.  She contends that, "it was error to terminate parental rights on this record."  Although we agree that the record suggests the two had positive visits, this evidence does not compel an affirmative finding on the second element as a matter of law.

It is not necessary that the child be primarily bonded with the parent for the exception to apply.  (*In re J.D.* (2021) 70 Cal.App.5th 833, 859.)  However, "[f]riendly or affectionate visits are not enough."  (*In re G.H.* (2022) 84 Cal.App.5th 15, 25; see *id.* at p. 27; accord, *In re Katherine J.* (2022) 75 Cal.App.5th 303, 318 ["the beneficial relationship exception demands something more than the incidental benefit a child gains from any amount of positive contact with her natural parent"].)  To avoid termination of parental rights, Mother was required to "do more than demonstrate 'frequent and loving contact[,]' [citation] an emotional bond with the child, or that [they] find their visits pleasant."  (*In re Derek W.* (1999) 73 Cal.App.4th 823, 827.)

"A positive attachment between parent and child is necessarily one that is not detrimental to the child but is *nurturing* and provides the child *with a sense of security and stability*," and "an emotional attachment is one where the child views the parent as *more than* a mere friend or playmate and [whose] interactions with the parent were not ambivalent, detached, or indifferent."  (*In re B.D.* (2021) 66 Cal.App.5th 1218, 1230, italics added.)

Here, even if we assume it is undisputed that Mother was appropriate with C.K. and attended to her needs during visits, the evidence does not compel a finding that C.K. has a "substantial" emotional attachment to her.  Of course, C.K. is too young to tell the social worker (or anyone else) how she feels about Mother.  Mother hopes to fill that void with evidence that

there were a couple of occasions, during a single month of visitation, that C.K. cried and clung to her at the end of visits.

But this evidence is not dispositive evidence that C.K. has a substantial emotional attachment to Mother. After all, it is also undisputed that in these instances C.K. settled easily with her caregivers within a few minutes. In reviewing factual determinations for substantial evidence, it is not our job to reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts. (*Caden C., supra*, 11 Cal.5th at p. 640.) Mother also testified that C.K. calls her "Momma" and was sometimes affectionate with her. But we know of no authority that suggests such evidence compels a finding that C.K. had a substantial, positive emotional attachment to Mother.

In fact, the remainder of the factors do not weigh in favor of a finding in Mother's favor on the second element. C.K. was less than two years old at the time of the section 366.26 hearing and, at that point, had been in foster care her entire life (excepting the day she was born). It is clear that Mother loves C.K. and that her visits with C.K. have been consistent and pleasant. However, that is simply not enough to meet the parent's burden of proving the kind of qualitative attachment that the parental benefit exception requires.

Mother relies on *In re A.L.* (2022) 73 Cal.App.5th 1131 (*A.L.*), which does not support her substantial evidence challenge. Here, unlike in *A.L.*, the trial court's finding on the second (benefit) element was adverse to Mother. (Cf. *id.* at p. 1155 [stating that juvenile court determined "father in fact had satisfied the second component of the parental-benefit exception" and concluding "substantial evidence support[s] this express finding"].) *A.L.* does nothing to advance Mother's argument that a benefit finding in her favor was compelled by the evidence.

Finally, Mother hints that the juvenile court considered an improper factor—the fact that Mother was unable or unwilling to

16

maintain sobriety and a safe home for C.K.  Mother is right that *Caden C.* mandates a parent's continuing struggle with the issues leading to dependency may not, standing alone, serve as a bar to applying the exception to terminating parental rights.  (*Caden C.*, *supra*, 11 Cal.5th at pp. 634, 637.)  Nonetheless, a parent's struggles will "often prove relevant to the application of the exception" because "[a] parent's struggles may mean that interaction between parent and child at least sometimes has a ' "negative" effect' on the child."  (*Id*. at p. 637.)

Here, the juvenile court did not directly tie its findings on the second element to any observations about Mother's progress on the underlying issues in the dependency.  And there is nothing in the record before us to suggest that the Department urged the juvenile court to rule against Mother solely because of her struggles with her case plan.  True, the court did point out how little time the two had spent together.  But this was permissible. (See *Caden C., supra,* 11 Cal.5th at pp. 632, 637, 639.)

On this record, viewed in the light most favorable to the juvenile court's determination, we conclude the juvenile court could reasonably find Mother failed to show C.K. had a "substantial, positive, emotional attachment" to her or that C.K. "would benefit from continuing [their] relationship." (*Caden C., supra*, 11 Cal.5th at p. 636.)  The court's finding on the benefit prong is supported by substantial evidence.  We need go no further.  (*In re Katherine J., supra*, 75 Cal.App.5th at p. 322, fn. 10 [a parent's failure of proof on any one of three elements of beneficial relationship exception is fatal].)

**3.**

Even assuming Mother proved that she and C.K. share a substantial, positive emotional attachment, we would nonetheless conclude the juvenile court did not abuse its discretion by finding that terminating the relationship would not be detrimental to C.K.

17

"[I]n assessing whether termination would be detrimental, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home." (*Caden C., supra*, 11 Cal.5th at p. 632.) "Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship. [Citations.] What courts need to determine, therefore, is how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life. . . . [T]he effects might include emotional instability and preoccupation leading to acting out, difficulties in school, insomnia, anxiety, or depression. Yet . . . a new, stable home may alleviate the emotional instability and preoccupation leading to such problems, providing a new source of stability that could make the loss of a parent not . . . detrimental." (*Id.* at p. 633.)

Here, the Department removed C.K. from Mother's custody on the day she was born, and she has spent the entirety of her young life (about 19 months) in foster care. Mother presented no evidence that C.K. would be detrimentally affected by losing their relationship—other than the evidence that she experienced brief difficulty in transitioning after two visits with Mother. On the other hand, it is undisputed that C.K. is strongly bonded to her caregivers and to her brother, with whom she also lives. We understand that the section 366.26 hearing "is decidedly not a contest of who would be the better custodial caregiver." (*Caden C., supra*, 11 Cal.5th at p. 634.) But in assessing the potential detriment to C.K. from adoption, it was entirely appropriate for the juvenile court to consider the strength and quality of her respective relationships. (*A.L., supra,* 73 Cal.App.5th at p. 1157; see *Caden C.*, at p. 634 ["[i]n many cases, 'the strength and quality of the natural parent/child relationship' will substantially determine how detrimental it would be to lose that relationship,

18

which must be weighed against the benefits of a new adoptive home"].)

Mother maintains the court erred by assuming that C.K.'s relationship with her would continue after termination of parental rights. Although the social worker noted that C.K. could possibly have a relationship with Mother even if her rights were terminated, there is nothing in the record that affirmatively suggests the juvenile court relied on this suggestion. Mother concedes as much.

The juvenile court did not abuse its discretion in concluding that the benefits to C.K. that will be provided by the strength and stability of an adoptive home are not outweighed by any harm she will suffer from severing her bond with Mother.

## DISPOSITION

The order terminating parental rights is affirmed.


BURNS, J.

WE CONCUR:


SIMONS, ACTING P.J.
CHOU, J.

*In re C.K. / Sonoma County Human Services Department v. Sarah C.  (A170926)*

19